Larry MINGS, Charles Douglas Grabow and Daisy G. Riley,
a/k/a Stacey Smith *v.* STATE of Arkansas

CR 94-377 884 S.W.2d 596

Supreme Court of Arkansas
Opinion delivered October 10, 1994
[Rehearing denied November 14, 1994.]

*Gene O'Daniel*, for appellants.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Larry Mings, Charles Grabow, and Stacey Smith were traveling on Interstate 40 in a rented motor home. A state trooper stopped the motor home because it was weaving back and forth between the shoulder and the lane line. Smith, one of the lessees, consented to a search. Five compressed bricks of 90% pure cocaine with a retail value of four million dollars were found inside the vehicle. Mings, Grabow, and Smith were jointly charged with possession of cocaine with the intent to deliver. Each was convicted, and each now appeals. We affirm the convictions of all three.

## I.

Mings lives in Little Sioux, Iowa and, on May 3, 1993, drove his pickup to a Best Western motel in Houston, Texas. The motel is adjacent to the international airport. After checking into the motel he called one of his sons, Bill, who lives in the Houston area. The next day Bill came to the motel to see his father, and he brought Grabow with him. Mings had casually known Grabow, and the woman who lived with him, Smith, for about two years. On May 5, Bill received a emergency phone call which necessitated his leaving Houston. Mings had very little cash with him and borrowed $300.00 from Bill before he left. Mings testified

that, soon after Bill left, Grabow and Smith came to his room and said they were going to rent a motor home and drive to Branson, Missouri to see some of the shows. They asked if he would like to go to with them and come back to Houston on May 10th. Mings said Smith borrowed $1500.00 from his son Bill to rent the motor home.

To the contrary, Smith testified that both the trip to Branson and renting the motor home were Mings's idea and that she rented the motor home only at Mings's request. She testified that Mings fronted $1500.00 in cash for the rental of the motor home. She further testified that Mings was not coming back to Houston with Grabow and her, but, instead, was going to meet his son and go somewhere else.

Veronica Villatoro, who worked at the rental agency that rented the motor home, testified that Smith phoned her three or four times on May 4th about renting a motor home. A person named Oliver had returned a motor home to the agency on the 3rd, and it seemed to be the style that Smith wanted. After Oliver returned the motor home it was cleaned inside and outside and nothing unusual was seen. Ms. Villatoro personally made a brief inspection and did not see anything unusual inside it. The motor home remained on the agency's enclosed lot until later taken by Smith. On May 4, Villatoro told Smith the agency now had available the style of motor home she wanted. The next afternoon, May 5, Mings and Smith got into Mings's pickup truck and drove the short distance to the rental agency, which was also located near the airport, to rent the motor home. Mings testified that he took Smith to the agency because Grabow asked him to do so. Villatoro testified that Smith came into the rental office late in the afternoon of May 5, accompanied by Mings. Smith told Villatoro that her name was Daisy Riley, and she produced a Texas driver's license for a Daisy Riley. Smith signed the rental agreement with the name Daisy Riley and listed Daisy Riley's Texas driver's license number as hers. Mings also signed the rental agreement as a lessee. Villatoro testified that Smith had a small purse with her and took out enough cash to pay the rental fee and deposit. She paid a $799.15 rental fee, and a $500.00 cash deposit to cover any damages to the motor home. All totaled, this amounted to 85 cents less than $1,300.00 that she paid in cash. It was agreed that the motor home would be returned on May

10th. Mings drove the motor home and Smith drove Mings's pickup truck back to the airport motel where Mings had a room. Smith testified that she and Grabow had a residence in Houston and that she wanted to go there to get some clothes for the trip, but Mings rented a room for them in the motel and said that he would buy her some clothes on the way to Branson. The motor home was parked outside the motel that night. Mings testified that the motel had "security."

Smith testified that early the next morning, May 6, Mings left his motel room and was sitting in the motor home with the motor running before she and Grabow got in. Mings testified that he, Smith, and Grabow left the motel together and got into the motor home together. Mings testified that he drove the motor home from the motel to "about forty to seventy miles south" of where they were stopped. At that point Grabow began driving and continued to do so until they were stopped by an Arkansas state trooper. Mings was riding in the front passenger's seat when the motor home was stopped.

A state trooper, Karl Byrd, was one of six members of the Arkansas State Police that were assigned to the area as a part of a "saturation" program. Their assignment, after making legitimate traffic stops, was "to take the stops farther." "Instead of jumping out and writing a ticket, we talk to the people and try to see if there's any criminal activity going on." Trooper Byrd saw the motor home being driven in a weaving manner onto the shoulder of the Interstate and back to the lane line. He stopped the motor home and asked the driver to get out and stand near the rear of the vehicle. He asked about the erratic driving. Grabow, who was driving, told the trooper that he had very little experience driving a motor home and also that the wind was bothering him. The trooper observed that Grabow had a Bandito tattoo on his arm. The trooper asked to see Grabow's driver's license, got some information from it, and went back to his police car to ask for information about Grabow by police radio. Grabow stood behind the motor home and in front of the police car. The trooper testified that Grabow was extremely nervous and evidenced a "noticeable shaking." The radio report came back informing the trooper that Grabow had several felony convictions and was, at that time, on parole for murder. The trooper went back to the motor home and briefly asked some questions of Smith, who was

in the back of the motor home with a child of Grabow's. She said the motor home was rented to her. The trooper handed Grabow a warning ticket and asked if there was contraband in the motor home. Grabow replied there was not. The trooper asked if he could search the motor home and Grabow replied that he could, but he would have to ask Smith because she had rented the motor home.

The trooper asked Smith if she would consent to a search of the motor home. She got out of the motor home, and the trooper explained to her that he could not search the motor home unless she consented. He also explained that she had the right to refuse to consent to the search. She consented and, as Daisy Riley, signed a consent to search form. She then stood with Grabow in the area between the back of the motor home and the police car. Mings also got out of the motor home.

Another state policeman, Sergeant John Scarberough, was nearby and was contacted by Byrd by radio. Scarberough quickly arrived and joined Trooper Byrd in the search. Almost immediately, Sergeant Scarberough found 11.17 pounds of cocaine hidden under a drawer which was below a closet inside the motor home. The cocaine was divided into five bricks with each of the bricks being separately wrapped in a thin plastic wrapping. Trooper Byrd informed them they were under arrest. Smith did not reveal her true identity and, as a result, was charged as Daisy Riley, the name in which she had rented the motor home and the name appearing on her driver's license. She did not disclose her real name in any of the preliminary proceedings. It was only when she testified in the circuit court trial that she gave her real name, Stacey Smith, and stated that the Daisy Riley driver's license and identification were false. As a result, she was charged as Daisy Riley, and the State did not check her background before she was cross-examined. That is also the reason this appeal was lodged with her name as Daisy Riley.

At the time they were arrested Mings had $1,116.50 in cash. The small amount of clothes he had with him were nearly all new, and some still had tags on them. Smith and Grabow had no clothes other than those they wore. Smith testified that personal finances at the time were "tough" for her and Grabow, as neither of them had a job.

## II.

 Each of the appellants argues that the foregoing evidence was insufficient to sustain his or her conviction for possession of cocaine with intent to deliver, and that the trial court erred in refusing to grant his or her motion for a directed verdict. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Littlepage* v. *State*, 314 Ark. 361, 863 S.W.2d 276 (1993). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, whether direct or circumstantial. *Brown* v. *State*, 315 Ark. 466, 869 S.W.2d 9 (1994). Evidence is substantial if it is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Thomas* v. *State*, 312 Ark. 158, 847 S.W.2d 695 (1993). On appeal, this court need only look at that evidence most favorable to appellee and consider only that testimony which supports the verdict. *Brown*, 315 Ark. at 471, 869 S.W.2d at 12.

It is not necessary for the State to prove literal physical possession of drugs in order to prove possession. *Osborne* v. *State*, 278 Ark. 45, 643 S.W.2d 251 (1982). Possession of drugs can be proved by constructive possession. *Littlepage* v. *State*, 314 Ark. 361, 863 S.W.2d 276 (1993). Constructive possession can be implied when the drugs are in the joint control of the accused and another. However, joint occupancy of a vehicle, standing alone, is not sufficient to establish possession or joint possession. There must be some other factor linking the accused to the drugs. *Osborne*, 278 Ark. at 50, 643 S.W.2d at 253. Other factors to be considered in cases involving automobiles occupied by more than one person are: (1) whether the contraband is in plain view; (2) whether the contraband is found with the accused's personal effects; (3) whether it is found on the same side of the car seat as the accused was sitting or in near proximity to it; (4) whether the accused is the owner of the automobile, or exercises dominion and control over it; and (5) whether the accused acted suspiciously before or during the arrest. *Plotts* v. *State*, 297 Ark. 66, 69, 759 S.W.2d 793, 795 (1988).

In this case there was joint occupancy of the motor home, and each of the appellants had some degree of control over it at the time of the arrest. Mings was one lessee of the rented vehi-

cle. Smith was a lessee even though she had leased the vehicle in a false name. Grabow was the driver. The cocaine weighed 11.17 pounds and was packaged into five bricks. The bricks were so large that in an exhibit they cover practically all of the seat of an office chair. The bulk of the cocaine was so great that it was not merely a residue inadvertently left in the motor home by someone else. The size and location of the bricks is substantial circumstantial evidence that the bricks were deliberately hidden under the drawer in the motor home. The cocaine's retail value, four million dollars, is additional, strong circumstantial evidence that the cocaine was not inadvertently left in the motor home by someone else.

Additionally, as some circumstantial evidence, it was improbable that some third party would have guessed the three appellants would rent a motor home and travel to Branson, but, even if some third party might have so guessed, it is even more inconceivable that the third party would hide four million dollars worth of drugs in the motor home in the hope that the appellants would in fact go to Branson, and that the third party could in some way recover the cocaine. Such a notion is even more untenable when the fact is considered that the motor home was inspected inside and outside before Mings and Smith leased it, and nothing unusual was seen. The motor home then remained on an enclosed lot until Smith and Mings rented it. Thus, the size and value of the drugs constitute some circumstantial evidence that appellants were aware of, and in possession of, the drugs. The fact that the motel where all three stayed was adjacent to the international airport is also some slight circumstantial evidence in this particular case, especially since Grabow and Smith had a home in Houston but spent the night at the motel next to the airport.

The additional factors linking the individual appellants to the cocaine are as follows. Smith testified that Mings is the one who planned the trip from Texas to Missouri and that Mings fronted $1,500.00, in cash, for her to rent the motor home. It is undisputed that Mings drove Smith to the agency to rent the motor home and later drove the motor home back to the motel. Mings signed the agreement as one of the lessees, and, according to Smith, Mings had the opportunity to place the drugs in the motor home on the morning they left Houston. Mings drove the motor home out of Houston. Smith testified that Mings was not going

to return to Houston even though his pickup truck remained there. Mings said he had to borrow $300.00 from his son to make the trip to Branson, yet he had $1,116.50 in cash when he was arrested.

Smith called the rental agency three or four times on May 4th, and signed the rental agreement on the 5th as one of the lessees. She gave a false name and used a false driver's license. She paid cash to rent the motor home even though she was unemployed and times were "tough" for her and Grabow. Mings said the trip was made at the urging of Smith and Grabow. Finally, Smith was inside the motor home near the drugs when the officer asked to search the vehicle.

Grabow was driving the vehicle at the time of the arrest. He appeared to be "extremely nervous" and there was a "noticeable shaking" about him. Mings testified that Grabow and Smith urged him to make the trip, and Grabow asked Mings to drive Smith to the rental agency to rent the motor home. Grabow and Smith stayed at the motel with Mings, even though Grabow and Smith had a home in Houston.

All three were on a journey from Houston to Branson, a good distance, supposedly to see the shows. The motor home was to be returned to Houston on the 10th, so the trip was ostensibly for five days. Yet all admitted they were only casually acquainted. Grabow and Smith did not have enough clothes for the extended stay, and most of Mings's clothes had just been purchased. Taken together, there was sufficient circumstantial evidence for the jury to reasonably conclude that all three were in joint control and possession of the cocaine as "mules," carrying four million dollars worth of drugs from the Houston International Airport area to Branson, Missouri.

### III.

Each appellant separately argues that the stop of the motor home was in violation of his or her Fourth Amendment rights and that the trial court erred in refusing to suppress the evidence seized in the search. Each makes the primary argument that his or her arrest was pretextual. They do not challenge the constitutionality of the saturation program, but argue that the saturation program itself showed that the police had an ulterior motive in making the stop, and, therefore, the arrests were pretextual.

■ Pretextual arrests are unreasonable under the Fourth Amendment. *Richardson* v. *State*, 288 Ark. 407, 706 S.W.2d 363 (1986). Pretext is a matter of the arresting officer's intent, which must be determined by the circumstances of the arrest. *Ray* v. *State*, 304 Ark. 489, 495, 803 S.W.2d 894, 897, *cert. denied*, 501 U.S. 1222 (1991). An ulterior motive does not in itself render an arrest pretextual when there is a valid overt reason to make the arrest. *Hines* v. *State*, 289 Ark. 50, 55, 709 S.W.2d 65, 68 (1986). The reasoning is that the arrest for the overt violation would have taken place in any event; thus there is no reason to bring the Fourth Amendment and the exclusionary doctrine into play. *Id.* Professor LaFave writes, "[I]f the police stop X's car for minor offense A, and they 'subjectively hoped to discover contraband during the stop' so as to establish serious offense B, the stop is nonetheless lawful if 'a reasonable officer would have made the stop in the absence of the invalid purpose.'" 1 Wayne R. LaFave, *Search and Seizure* § 1.4 at 22 (Supp. 1994).

■ In this case the motor home was weaving from the shoulder to the lane line of the highway when the trooper stopped it. Therefore, a valid, objective reason existed for the stop. An "otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity." *United States* v. *Cummins*, 920 F.2d 498, 501 (8th Cir. 1990). Thus, the trial court correctly refused to suppress the evidence seized on the ground that the stop was pretextual.

There is a suggestion in Mings's brief that the search was objectionable under *Garrett* v. *Goodwin*, 569 F. Supp. 106 (E.D. Ark. 1982). That case is inapposite as it involved a roadblock where all vehicles were stopped without regard to whether a violation of the law had occurred.

■ Smith and Grabow argue that once Trooper Byrd issued the warning ticket to Grabow, there was no justification for continuing to hold them, and there was no justification for the greater intrusion caused by the search of the motor home because the totality of the circumstances known to the officer did not meet the requisite level of reasonable suspicion. They cite *United States* v. *Ramos*, 20 F.3d 348 (8th Cir. 1994) in support of their argument. We do not reach the issue because it was not raised

below. At trial, Smith and Grabow argued that the trooper was on a "fishing expedition" for drugs and that the trooper was trying to "find criminal activity in the area," but that argument was made in the context that the stop was pretextual. Appellants never apprised the trial court that the scope of the stop was exceeded after the warning ticket was issued because the officer did not articulate the requisite level of reasonable suspicion. When an appellant's argument at trial did not apprise the trial court of the argument made on appeal, we will not reach the argument. *Hewitt v. State*, 317 Ark. 362, 877 S.W.2d 926 (1994). Further, a party cannot change the basis of his argument on appeal. *Id*. Even constitutional arguments can be waived on appeal. *Green v. State*, 313 Ark. 87, 852 S.W.2d 110 (1993).

## IV.

■ Appellant Mings argues that the consent to search the motor home, which was given by Smith using the name of Daisy Riley, was not voluntarily given, and, as a result, the trial court erred in refusing to suppress the evidence seized in the search. The fact that Smith does not make such an argument for herself portends the lack of merit in Mings's argument. Even so, we reach the argument because Mings was one of the lessees of the motor home and had standing to object to the search. *See Littlepage v. State*, 314 Ark. 361, 863 S.W.2d 276 (1993). Trooper Byrd testified that Smith's consent was freely and voluntarily given. The trooper's testimony concerning voluntariness is supported by the form that was signed by Smith. Finally, the stop and Smith's giving consent were videotaped, and at the suppression hearing the trial court watched a videotape of the entire roadside proceedings. The videotape supports the trial court's finding.

## V.

■■ Grabow and Smith argue that the trial judge erred in not giving an instruction about proof of possession in joint occupancy cases. Again, we do not reach the issue. Appellants' attorney merely requested an instruction that would charge the jury that in cases of joint occupancy of a vehicle there must be some additional link between the accused and the contraband. A proposed instruction was not proffered to the trial court. We have

repeatedly stated that an appellant cannot assign as error the failure to instruct on any issue unless he has submitted a proposed instruction on that issue. *E.g., Stewart* v. *State*, 316 Ark. 153, 870 S.W.2d 752 (1994). Further, we have said that the proffered instruction must be included in the record and in the abstract to enable the appellate court to consider it. *Id.* In addition, the instruction or instructions given on joint occupancy were not abstracted. The State contends that an AMI criminal instruction on joint occupancy was given and that it adequately covered the subject. While we do not require an appellant to abstract all of the instructions given, where the issue is whether other instructions adequately covered an issue, we require that an appellant abstract the instructions given on the subject so that we can determine whether the other instructions did adequately cover the issue. *Ross* v. *State*, 300 Ark. 369, 779 S.W.2d 161 (1989). That was not done in this appeal.

Affirmed.