Dr. John SMITH, Vice President for Student Affairs, UCA;
Winfred L. Thompson, President, UCA; and Madison P.
Aydelott, III; Ben F. Burton; Elaine Goods; Rush Harding, III;
Jerry Malone; Joe M. White; and Dalda F. Womack,
Board of Trustees; UCA *v.* Heather A. DENTON

93-1297                                895 S.W.2d 550

Supreme Court of Arkansas
Opinion delivered April 3, 1995

*Mary B. Stallcup*, General Counsel for UCA, for appellants.

*Linda P. Collier*, for appellee.

ROSALIND M. MOUSER, Special Justice. In this appeal from a decision of the Faulkner County Chancery Court finding the firearms policy of the University of Central Arkansas facially void and violative of substantive due process and setting aside the three-year suspension of appellee Heather A. Denton, a UCA student, the appellants — the University of Central Arkansas and members of its administration and Board of Trustees[1] — raise four points for reversal.

---

[1] For convenience, the appellants will generally be designated as a group by the commonly recognized abbreviation "UCA."

UCA argues that (1) the court had no power to set aside UCA's disciplinary action against Ms. Denton, unless the university's action was arbitrary, capricious, and contrary to law; (2) UCA's decision to suspend Ms. Denton was neither arbitrary nor capricious; (3) UCA's decision to suspend Ms. Denton was not contrary to law; and (4) Ms. Denton received procedural due process. These four questions can be grouped more coherently under two broad issues: whether Ms. Denton received (1) procedural due process and (2) substantive due process. Although the chancellor did not address the former topic, we have determined, on *de novo* review, that Ms. Denton was denied procedural due process. We uphold the decision of the chancery court when it reaches the right result, even if it did not enunciate the right reason. *Cawood* v. *Smith*, 310 Ark. 619, 839 S.W.2d 208 (1992). It is unnecessary for us to address the substantive due process issue.

Ms. Denton requested and was denied damages and attorney's fees. On cross-appeal, she contends that the chancellor erred in finding that the actions of UCA and its agents did not exempt them from their immunity and in denying her damages and attorney's fees. We agree with the chancery court's findings and affirm its decisions on both the appeal and the cross-appeal.

*Facts*

In December 1992, after several firearms incidents on its campus, UCA issued a revised firearms policy, which provided that:

> Any student possessing, storing, or using a firearm on University controlled property or at University sponsored or supervised functions, unless authorized by the University, will be suspended from UCA for a period of not less than three years unless a waiver of the suspension is granted by the President upon the recommendation of the Vice President for Student Affairs.

A copy of the amended firearms policy was delivered to every student organization and residence-hall room and was published on January 11, 1993, in the student newspaper.

On the morning of Saturday, February 13, 1993, Heather A. Denton, a UCA freshman honors student on a full academic schol-

arship with no disciplinary record, loaned her automobile to a friend, Victor Smith, a non-student. The vehicle was returned to her later in the day.

That evening, Ms. Denton, Eric Patterson, a UCA student, and a mutual friend, Rita Patel, went "cruising" off-campus in Ms. Denton's car, with Mr. Patterson driving. While they were stopped in downtown Conway, a confrontation occurred with unknown occupants of a pickup truck. During the incident, a third vehicle arrived on the scene, and, reportedly, an unidentified person in that car waved a handgun.

Soon after these events, Mr. Patterson drove Ms. Denton's car back to the UCA campus. A Conway police officer, who had received a report about the incident (including the brandished weapon), located and followed Ms. Denton's vehicle to the campus and then stopped and searched it. An unloaded semi-automatic weapon was found in a backpack-style book bag beneath the passenger seat. Ms. Denton, Mr. Patterson, and Ms. Patel denied knowledge of the presence of the gun, though Mr. Patterson stated that it was owned by Victor Smith. Mr. Patterson was arrested and removed from the scene of the stop. No action was taken against either Ms. Denton or Ms. Patel by law enforcement officials.

After becoming aware of the incident, appellant Dr. John Smith, UCA Vice-President for Student Affairs, interviewed Ms. Denton on Monday, February 15, 1993. During the interview, Dr. Smith advised her that she was being charged with a violation of the firearms policy and was being suspended pending a determination by the Student Judicial Board. Dr. Smith ordered Ms. Denton to leave the campus immediately. No written notice of the charge was given to Ms. Denton prior to this meeting, nor did Dr. Smith simultaneously document the interview.

On Wednesday, February 17, 1993, some four days after the incident, the Student Judicial Board conducted a hearing. Various witnesses gave testimony, including Victor Smith, who admitted that he was the owner of the gun and that he had borrowed Ms. Denton's car to go shooting at targets with Mr. Patterson and his brother. He said that after they had finished, he put the gun in the book bag and placed it in the floorboard behind the passenger seat without Ms. Denton's knowledge or permission.

The Board found Ms. Denton not guilty of the charge, declaring its belief that she "did not have knowledge that the weapon was in the car," and recommended that no action be taken against her. Dr. Smith, however, rejected the Student Judicial Board's finding and determined that Ms. Denton should be suspended. Ms. Denton then appealed Dr. Smith's decision to the University Discipline Committee, which found her guilty of a violation of the firearms policy but recommended that the sanction be reduced. Dr. Smith, to whom the recommendation had been referred, withdrew from further consideration of the case.

As a result, Ms. Denton appealed the decision to appellant Dr. Winfred L. Thompson, President of UCA, who upheld the University Discipline Committee's guilt determination but rejected its recommendation of a reduced sanction. Dr. Thompson then imposed the three-year suspension provided for in the UCA firearms policy.

On March 11, 1993, Ms. Denton filed a petition for a temporary restraining order in the Faulkner County Chancery Court, requesting that the court stay or enjoin her suspension from UCA. The following day, the chancellor entered a temporary injunction. Subsequently, on March 31, 1993, Ms. Denton filed an amended petition for a permanent injunction, asserting that UCA's firearms policy failed, on its face, to provide substantive due process and that UCA's actions failed to provide procedural due process. An expedited hearing was held on April 8 and 16, 1993. The chancery court converted the temporary restraining order into a permanent restraining order, finding that:

> the UCA gun policy violates the 5th and 14th Amendments to the Constitution of the United States of America, in that it is violative of substantive due process; that is, the policy is void on its face and violates basic principles of democracy. The policy is hereby struck and any attempts to enforce the said policy against any student subsequent to April 16, 1993, will be sanctioned by the inherent contempt authority of the Court.

Having found that the firearms policy was facially void, the chancery court declared the procedural due process issue moot and declined to issue a ruling on the question. The court also found that the actions of UCA and its agents did not remove their

immunity and, therefore, that Ms. Denton was not entitled to damages and attorney's fees. From that order, this appeal and cross-appeal arise.

### Standard of review[2]

As the Administrative Procedure Act is not applicable to this case, we consider the evidence presented at trial on a *de novo* basis. The avenue for judicial review of the substance of academic decisions is narrow. *See Regents of the University of Michigan* v. *Ewing*, 474 U.S. 214 (1985). There is a general policy against intervention by the courts in matters best left to school authorities. *Henderson State University* v. *Spadoni*, 41 Ark. App. 33, 848 S.W.2d 951 (1993).

It is undisputed that UCA is a state-supported institution of higher learning which may delegate to its administration disciplinary power over non-academic offenses. A chancery court has no power to interfere in the exercise of a state-supported university's discretion in the promulgation and implementation of disciplinary measures unless it is shown by clear and convincing evidence that the university abused its discretion. *See Springdale Board of Education* v. *Bowman*, 294 Ark. 66, 740 S.W.2d 909 (1987); *Williams* v. *Board of Marianna School District*, 274 Ark. 530, 626 S.W.2d 361 (1982); *Safferstone* v. *Tucker*, 235 Ark. 70, 357 S.W.2d 3 (1962). We hold that there was clear and convincing evidence, outlined in the discussion below, that UCA's actions constituted an abuse of the university's discretion.

### Procedural due process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution gives rights to a student who faces suspension or expulsion for misconduct at a tax-supported college or university. *Henderson State University* v. *Spadoni, supra, citing Dixon* v. *Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961). A student facing suspension is entitled, at the very minimum, to some kind of notice and some kind of hearing. *Goss* v. *Lopez*, 419 U.S. 565 (1975).

---

[2]UCA's first point for reversal is, in fact, merely a statement of the appropriate standard of review, and we treat it accordingly.

The UCA "Standards of Student Conduct" promulgates disciplinary procedures governing the enforcement of university regulations. The student handbook notes that "the University strives to protect the rights of students involved in the disciplinary process by providing *specific due process procedures*, including appeals, to insure fair and just hearings." (Emphasis added.) The Vice President for Student Affairs is charged with the responsibility of overseeing the disciplinary process and is assisted by several committees and hearing officers who are assigned specialized functions. The Student Judicial Board, comprised of eleven voting student members and the Dean of Students or a designee in an advisory capacity, hears serious, suspendable offenses. Appeals may be made to the University Discipline Committee, UCA's chief appellate body, which consists of three faculty members, three administration representatives, and three students.

The disciplinary process is initiated by the filing of a written report of an alleged incident of non-academic misconduct with the Office of Vice President for Student Affairs. Thereafter, according to the "Standards of Student Conduct":

> *The Dean of Students will receive incident reports and assign discipline cases to the appropriate council and/or hearing officer as needed.* The Student Judicial Board [or other appropriate council or hearing officer] make their recommendations to the Vice President for Student Affairs. Disciplinary action shall be taken only after a hearing is held and the Vice President for Student Affairs has reviewed the action and made a final decision.

(Emphasis added.) The hearings are conducted informally, without strict adherence to the rules of evidence.

A notice provision is set forth in the "Standards":

> The student(s) accused shall be notified, *in writing*, of the alleged charge and of the date, time and place of the hearing. Notice of hearing will be *mailed to the student(s) or delivered to the residence hall room, if the student(s) lives on campus, at least three (3) days prior to the hearing.*

(Emphasis added.) The accused and complainant are afforded the right to be present at the hearing, to present evidence by wit-

ness, affidavit, or deposition, to bring an advisor to the hearing, and to question all witnesses.

Appeals are assigned to the University Discipline Committee and must be made in writing to the Vice President for Student Affairs within three days after a disciplinary decision is rendered. One or more of the following reasons may serve as the basis of an appeal:

1. Inadequate opportunity to prepare defense;

2. Inadequate evidence to justify decision; or

3. Sanction not in keeping with gravity of wrong-doing.

The Vice President for Student Affairs is vested with the authority to make the final decision regarding all disciplinary concerns.

In the present case, UCA failed to adhere to its own expressly enunciated standards for ensuring procedural due process. The procedures provided by the university were not structurally flawed; in terms of actual compliance, however, the letter and spirit of procedural due process were violated. To protect due process, the courts, in matters pertaining to a governmental entity's observance and implementation of self-prescribed procedures, must be particularly vigilant and must hold such entities to a strict adherence to both the letter and the spirit of their own rules and regulations. *See Powell* v. *Heckler*, 789 F.2d 176 (3rd Cir. 1986); *Koolstra* v. *Sullivan*, 744 F. Supp. 243 (D. Colo. 1990).[3]

Here, there was no indication that the Dean of Students' reviewed the charge against Ms. Denton before it was referred to Dr. Smith or before the case was assigned to the Student Judicial Board, as required by the UCA "Standards of Student Conduct." Instead, Dr. Smith, Vice President of Student Affairs, interviewed Ms. Denton on Monday, February 15, 1993, and verbally advised her that a disciplinary hearing would be held by the board. Having ordered her to leave the campus immediately, he then caused to be delivered to her vacated residence-hall room a written notice, dated February 15, 1993, of the hearing before

---

[3]Although the federal cases cited deal with Social Security claims, the stated principle was intended to apply to all governmental agencies.

the Student Judicial Board to be held "at 7:00 p.m., on Wednesday, February 17, 1993." The notice, which more properly should have been mailed to her permanent address, was sent to the dormitory room two days prior to the hearing rather than three days beforehand, as required by the "Standards."

█ Thus, UCA, by the terms of its own self-imposed standards, failed to provide Ms. Denton the promised protection of "specific due process procedures." Yet not only was there a failure to comport with the letter of procedural due process, there was also a failure to abide by its spirit. Throughout the proceedings, Dr. Smith acted in a variety of often-conflicting capacities. He was at once investigator, prosecutor, witness, and judge. Although Dr. Smith, as Vice President for Student Affairs, clearly held the ultimate authority in disciplinary matters, he overrode the decision of the Student Judicial Board. No provision was made in the UCA handbook for the Vice President for Student Affairs to step aside from a case, yet Dr. Smith did so following the University Discipline Committee's technical finding of guilt and its recommendation of a reduced sanction.

The matter was submitted for review to UCA President Dr. Winfred Thompson. He retained the three-year suspension because Ms. Denton's appeal was based only on the lack of adequate evidence and not on the appropriateness of the sanction.

While the severity of the sanction is a stated basis for appeal under the UCA "Standards for Student Conduct," the fact remains that "[a]ll non-academic discipline hearings are informal," according to the handbook. To deprive a student of her educational property interest on narrowly formal grounds as exemplified in these circumstances is to violate the spirit of procedural due process. We hold that Ms. Denton was denied the "rudimentary elements of fair play" required by the Due Process Clause. *See Henderson State University* v. *Spadoni, supra, citing Dixon* v. *Alabama State Board of Education,* 294 F.2d 150, 159 (5th Cir. 1961).

Under the circumstances, Ms. Denton was denied procedural due process. We therefore affirm the decision of the chancery court, albeit for a different reason than that given by the chancellor. *Cawood* v. *Smith, supra.*

## Cross-appeal: Attorney's fees

■■ The Arkansas Constitution prohibits awards of damages in lawsuits against the State of Arkansas and its institutions. Ark. Const. Art.5, § 20. If officers and employees of the State of Arkansas act without malice and within the scope of their employment, they are immune from an award of damages in litigation.

■ The chancery court specifically found that none of the officers and employees of UCA acted with malice. Likewise, the actions of UCA's officers and employees fail to rise to "such reckless disregard of the rights of another as to constitute the equivalent of ill will." *Bland* v. *Verser*, 299 Ark. 490, 774 S.W.2d 124 (1989). We affirm the chancery court's findings on Ms. Denton's cross-appeal.

Based upon the facts as found by the chancery court and the law set forth herein, we affirm the chancery court's decision in all respects.

Affirmed.

NEWBERN, J., concurs.

BROWN, J., dissents.

ROAF, J., not participating.

DAVID NEWBERN, Justice, concurring. The problem in this case, I think, is that the UCA firearms policy is offended by "possession" of a firearm without knowledge. The Student Judicial Board found Ms. Denton not guilty because she had no knowledge the pistol was in her car. Dr. Smith testified the school policy was violated regardless of knowledge. The Chancellor apparently gagged on that point and declared the policy to be in violation of Ms. Denton's right to substantive due process.

While I agree UCA violated its own procedures somewhat, I also agree with the dissenting opinion's point that we seem to be stretching to decide the case on that basis. The dissenting opinion seems equally extended, however, in its apparent conclusion that the evidence is sufficient to show Ms. Denton knew of the presence of the pistol in her car because it was in a book bag which was not pushed under the seat. I know of no evidence

that the book bag was transparent or that anyone told her the pistol was in it. I dare say that had the contraband been drugs we would not have found the evidence of the presence of it in Ms. Denton's car satisfied the constructive possession factors required to hold her in "possession." *See Mings* v. *State*, 318 Ark. 201, 884 S.W.2d 596 (1994). Those factors all point to whether the accused had knowledge of the presence of the contraband.

Substantive due process requires that legislation be rationally related to achieving a legitimate governmental purpose. *See Winters* v. *State*, 301 Ark. 127, 782 S.W.2d 566 (1990). No doubt UCA had a legitimate governmental purpose for its policy, and the zeal with which the administration sought to implement it is laudable up to a point.

A policy which can be the basis of punishment of one who is the victim of circumstances created by others without her knowledge can also be said to be related to that purpose. It could place even the most innocent student in fear of being punished and thus perhaps serve the purpose. Such a policy is, however, in my view, irrational and unfair to the point that it cannot be said to be rationally related to anything. The Chancellor got this case right. I concur in the result reached by the majority opinion.

ROBERT L. BROWN, Justice, dissenting. This case involves the suspension of Heather Denton for having a semi-automatic pistol (TEC .22) and four loaded clips of ammunition (three fully loaded with 30 rounds and one with 29 rounds) in her car on campus. The majority stretches to affirm this case and ultimately does so on a completely different basis than that employed by the chancellor. The chancellor granted the injunction because he believed that Ms. Denton lacked the culpable intent to possess the pistol or even knowledge of it. According to the majority, however, Heather Denton was not afforded procedural due process because the notice of her first hearing before the Student Judicial Board was inadequate and the letter of the Student Handbook was not followed in every respect.

The majority is wrong to equate minor lapses in Student Handbook procedures with a violation of the United States Constitution. It is also wrong to affirm for reasons not even raised by Ms. Denton in her pleadings or argued in her brief in this appeal. What she argued to the chancellor was that Dr. John

Smith was somehow biased against her and that Dr. Thompson should have discussed the case with her and her mother prior to the Discipline Committee meeting. However, the chancellor found: "I think Dr. Smith was simply trying to enforce the policy as he had been instructed to. And I find no fault in the way he has conducted himself in this matter, whatsoever."

The majority disagrees and raises procedural lapses never pursued by Ms. Denton. What is patently unfair about this is the University has not had the opportunity to answer the majority's asserted procedural deficiencies which amount to findings and conclusions by an appellate court. Ms. Denton never asserted a violation of her procedural due process rights in this appeal. The University, as a matter of fact, did contend that due process was given to Ms. Denton and told this court specifically how and why. Ms. Denton did not take issue with that contention. Now a majority of this court does take issue with that contention and does so in a way that forecloses the opportunity of UCA to respond.

But irrespective of the majority's stretch to find a theory for the affirmance, there was no violation of procedural due process in this case. In December 1992, the University Board of Trustees adopted the gun policy at issue because of firearm incidents on campus:

> Any student possessing, storing, or using a firearm on University controlled property or at University sponsored or supervised functions, unless authorized by the University, will be suspended from UCA for a period of not less than three years unless a waiver of the suspension is granted by the President upon the recommendation of the Vice President for Student Affairs.

The gun policy was fully disseminated to the student body.

On February 13, 1993, Heather Denton and the driver and a passenger, Eric Patterson and Rita Patel, were stopped in Ms. Denton's car, a two-door Pontiac Firebird, on campus by a Conway police officer, Michael Edgmon. Edgmon had been following the car after a disturbance report at a Conway intersection. He searched the car at which time the automatic pistol and clips of ammunition were located in a black bag which had been partially pushed under the passenger seat from behind that seat. The

bag was not under the seat as the majority proclaims. Ms. Denton denied knowledge of the pistol and clips. Patterson told the arresting police officer that the pistol was owned by Victor Smith.

On February 15, 1993, Dr. John Smith, the University Vice President for Student Affairs, interviewed Heather Denton. He showed her the police report by Officer Edgmon and advised her that she was charged with violating the University's gun policy and was suspended pending a hearing. According to Dr. Smith and Ms. Denton, after being advised of the charge, they discussed alternatives for a hearing. Dr. Smith told her that she could have an administration hearing as early as the next day before the Dean of Students, Dr. Gary Roberts, or a hearing before the Student Judicial Board. The latter hearing was already scheduled for Wednesday, February 17, 1993. Ms. Denton stated that she would talk to Eric Patterson about it. She opted for a hearing before the Student Judicial Board.

Dr. Smith testified that he sent her a copy of his suspension letter dated February 15, 1993, with notice of the disciplinary hearing before the Student Judicial Board and a copy of Officer Edgmon's police report. It is unclear whether he gave a copy of either to her at that meeting. The letter and police report were introduced as a joint exhibit at the subsequent trial. Ms. Denton denied receiving the letter before the Student Judicial Board hearing, although she admitted seeing a copy of the police report before that meeting.

On February 17, 1993, the Student Judicial Board comprised of student members conducted a hearing on the matter. Ms. Denton was notified of the hearing and present throughout it. Various witnesses were called and testified on behalf of Ms. Denton, including Eric Patterson, Victor Smith, Heather Denton, and Rita Patel. Officer Edgmon, Associate Director of the Department of Public Safety Glenn Stacks, and Assistant Dean of Students John Cagle testified in support of the University's position. The majority opinion is in error when it concludes that the Dean of Students did not review the charge against Ms. Denton before the Judicial Board hearing. His assistant was at the hearing and participated. The Student Judicial Board recommended that no disciplinary action be taken against Ms. Denton because the Board believed that she did not know the gun was in her car.

On February 22, 1993, Dr. John Smith, after listening to the tapes of the Student Judicial Board hearing and after interviewing Ms. Denton, Eric Patterson, Victor Smith, Rita Patel, and Officer Edgmon as well as the Chairman of the Student Judicial Board rejected the Board's recommendation. He stated that he believed that she was "guilty of possessing a weapon on the UCA campus" and determined that suspension was in order. At the trial of this matter, he testified that possession of a weapon without knowledge was a violation of the gun policy but that knowledge of the weapon was important for deciding the penalty to be assessed. The inconsistencies in the participants' stories played a part in his decision to assess the three-year suspension. As between concluding that Ms. Denton knew of the handgun in her car or did not know, he concluded that she did. He especially was influenced by the fact that Victor Smith testified that he had thrown his black bag with the gun and clips on the floor in the back seat and had not pushed it under the seat. He was also influenced by the fact that Ms. Denton had been in her car earlier that afternoon when the gun and ammunition were there.

Ms. Denton appealed Dr. Smith's decision to the University Discipline Committee comprised of University faculty, staff, and students. On March 4, 1993, which was two weeks after the Student Judicial Board hearing, the University Discipline Committee voted unanimously to hear Ms. Denton's appeal and did so. Ms. Denton was notified of the hearing and attended. At the hearing that followed, Ms. Denton in attendance with her mother, Paula Jamison, testified and was questioned by the Chair of the Committee. Officer Edgmon also testified as did Dr. Smith. Officer Edgmon showed the gun and ammunition clips seized from the Denton car to the Committee. The Committee voted 5 to 2 to uphold the decision of guilty but to lessen the sanction. The Committee also voted to affirm the decision of guilty as to Eric Patterson and the full three-year suspension.

Ms. Denton next appealed the matter to Dr. John Smith to make the final decision. Because of Dr. Smith's involvement, he recused and turned the file over to University President Dr. Winfred Thompson. Dr. Thompson reviewed the matter, and on March 9, 1993, he upheld the Committee's decision but instituted a full three-year suspension for Ms. Denton.

On March 11 and 18, 1993, Ms. Denton filed her petitions for declaratory and injunctive relief. Later, a hearing on the petition was conducted and testimony was taken. At the conclusion of two days of testimony, the chancellor stated his ruling from the bench in which he referred to "gaping inconsistencies" in Ms. Denton's story. Later, the chancellor entered his decree (1) declaring the University's gun policy to violate substantive due process, and (2) granting a permanent injunction against the University's suspension of Ms. Denton. The chancellor further ruled that there was no need for him to discuss procedural due process and that issue was moot.

The standard of review for interference in university disciplinary matters is stringent indeed and was best summarized by a recent Court of Appeals decision:

> There is a general policy against intervention by the courts in matters best left to school authorities. "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint . . . . By and large, public education in our Nation is committed to the control of state and local authorities." *Goss* v. *Lopez*, 419 U.S. at 578, citing *Epperson* v. *Arkansas*, 393 U.S. 97 (1968). The courts have been reluctant to interfere with the authority of local school boards to handle local problems. *Fortman* v. *Texarkana Sch. Dist. No. 7*, 257 Ark. 130, 514 S.W.2d 720 (1974). A chancery court has no power to interfere with school district boards in the exercise of their discretion when directing the operation of the schools unless the boards clearly abuse their discretion. *Springdale Bd. of Educ.* v. *Bowman*, 294 Ark. 66 (1987). The burden is upon those charging such an abuse to prove it by clear and convincing evidence. *Bowman*, 294 Ark. at 71, 740 S.W.2d 909. Undoubtedly these general principles apply to disciplinary hearings for students at state supported universities and colleges.

*Henderson State University* v. *Spadoni*, 41 Ark. App. 33, 35, 848 S.W.2d 951, 953 (1993). Accordingly, the courts of this state should be most reluctant to interfere in disciplinary proceedings of state colleges and universities such as we have here except when violations of due process rights are clear and unmistakable.

Here, if anything, Ms. Denton received more in the way of due process protection than is required. She had two full hearings where she was present and where she testified and other witnesses testified on her behalf: one before the Student Judicial Board, which found her not guilty, and one before the University Discipline Committee, which found her culpable. In addition, her case was reviewed by the University Vice President for Student Affairs, Dr. John Smith, and by the President of the University, Dr. Winfred Thompson. That totals four reviews of her case before she took it to court.

The seminal case for procedural due process protection of students at state universities is *Dixon* v. *Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961). There, the students were expelled from college, and the Fifth Circuit Court of Appeals held that those students were entitled to notice of the charges and the witnesses against them and a hearing allowing both sides to present their positions in complete detail prior to expulsion as part and parcel of due process. Although the *Dixon* case is credited with establishing a property right in a student's attendance at a state university, the United States Supreme Court has yet to decide that issue. The Court has, however, *assumed* a student's property interest in higher education in order to reach certain due process issues. *See Regents of University of Michigan* v. *Ewing*, 474 U.S. 214 (1985).

The Eighth Circuit Court of Appeals has discussed procedural due process in the context of an unruly demonstration on a college campus:

> We do not hold that a school has the authority to require a student to discard any constitutional right when he matriculates. We do hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct; that, as to these, flexibility and elbow room are to be preferred over specificity; that procedural due process must be afforded (as Judge Hunter by his first opinion here specifically required) *by way of adequate notice, definite charge, and a hearing with opportunity to present one's*

*own side of the case and with all necessary protective measures*; that school regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedure; and that the courts should interfere only where there is a clear case of constitutional infringement.

*Esteban* v. *Central Missouri State College*, 415 F.2d 1077, 1089-1090 (8th Cir. 1969), *cert. denied*, 398 U.S. 965 (1970). (Emphasis added.)

Though we must assume that Ms. Denton did not receive written notice three days in advance of the Student Judicial Board hearing as the Student Handbook contemplates, she never complained of lack of notice. In fact, she had full notice of the hearing. In Dr. John Smith's office on February 15, 1995, she was shown a copy of Officer Edgmon's police report on the Saturday night incident. The two then discussed whether Ms. Denton wanted an expedited administrative hearing before the Dean of Students or a hearing before the Judicial Board in two days which was already scheduled to meet. She chose the latter. The Due Process Clause of the United States Constitution does not require a written three-day notice. It requires notice, and everyone admits that Ms. Denton got notice of the hearing in this case.

She also knew the witnesses against her and what they would say before the Judicial Board hearing on February 17, 1993. Ms. Denton admitted seeing the police report of Officer Edgmon, which was the essence of his testimony, before that hearing. She also knew in advance the administration's position as testified to by Assistant Dean of Students John Cagle. Ms. Denton, Eric Patterson, Victor Smith, and a friend, Rita Patel, testified in her favor, and the Judicial Board found her not guilty. Dr. Smith then listened to the tapes of the Student Judicial Board hearing and again interviewed pertinent witnesses and the Chairman of the Judicial Board. He decided not to accept the Board's recommendation.

Fifteen days later, Ms. Denton appeared with her mother at the University Discipline Committee hearing and testified on her own behalf as did Eric Patterson. She certainly had written notice and knowledge of the witnesses against her at this hearing. Officer Edgmon and Dr. Smith testified against her. After the Uni-

versity Discipline Committee hearing, Dr. Smith disqualified himself from making the final decision because of his previous involvement, and the University President, Dr. Thompson, made the ultimate determination. Short of having a full-blown judicial proceeding with counsel present and cross-examination, which due process does not require in this context, Ms. Denton was afforded more than adequate procedural safeguards. *See Board of Curators of the University of Missouri* v. *Horowitz*, 435 U.S. 78 (1978); *Dixon* v. *Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961), cert. denied, 368 U.S. 930 (1961); *Nash* v. *Auburn University*, 621 F. Supp. 948 (D.C. Ala. 1985).

Moreover, Dr. Smith did not violate the spirit of due process. He did investigate the initial charge against Ms. Denton on February 15, 1993, but he did not attend the Student Judicial Board meeting on February 17, 1993 — Assistant Dean of Students John Cagle did. Dr. Smith did attend the University Discipline Committee meeting on March 4, 1993 but only for the purpose of explaining his decision to suspend. That Committee did not agree with Dr. Smith's decision on the penalty, and for that reason he disqualified himself from making the final decision. Far from violating due process safeguards, Dr. Smith was zealous in making certain that they were provided, a fact which the chancellor acknowledged.

The majority complains that Dr. Smith performed protean roles in this matter. Then, illogically, the majority concludes that Dr. Smith was wrong to step aside and let President Thompson make the ultimate decision. The sole reason for Dr. Smith to remove himself from the final decision was to eliminate any suggestion of a conflict of interest. His actions were appropriate and should not be twisted into a reason for concluding that there was a denial of due process.

The majority cites no case for the principle that failure to adhere strictly to Student Handbook procedures amounts, in itself, to a violation of a constitutional magnitude. That is because there are none. Here, Ms. Denton did not complain of lack of notice of the first hearing because she received notice. She did not complain of surprise witnesses against her because there were none, and she had full opportunity to present her own case. That is all that due process requires.

I am fearful that by requiring such strict adherence to student handbooks and equating those procedures to what the U.S. Constitution requires, we undermine the ability of universities and even primary and secondary schools to enforce their disciplinary policies. In this case, a legitimate school gun policy was violated, and there were no procedural lapses of constitutional significance. Indeed, Ms. Denton was allowed to present her case fully on multiple occasions. I dissent.