Levine, J.
(dissenting). At issue here is the validity of pretextual traffic stops, that is, the seizure of a vehicle, ostensibly for an actual Vehicle and Traffic Law violation, but in reality effected only because of the officer’s determination to conduct an otherwise unauthorized investigation of suspected criminal activity (see, 1 LaFave, Search and Seizure § 1.4 [e], at 119-120 [3d ed]).
In our view, Whren v United States (517 US 806) inadequately protects a core value of both the Fourth Amendment and this State’s counterpart, New York Constitution, article I, § 12, in permitting arbitrary exercises of discretion on the part of police officers to conduct investigative stops of vehicles on the pretext of pursuing violations of the Vehicle and Traffic Law. Therefore, Whren should not be followed as a matter of State constitutional law.
I.
We believe it beyond debate that two equally fundamental norms animated adoption of the Fourth Amendment and were embedded in the search and seizure jurisprudence of the Supreme Court and this Court. The first was that persons and their houses, papers and effects were not to be subjected to unjustified searches and seizures; hence, the requirement that “no Warrants shall issue, but upon probable cause” (US Const Amend IV; NY Const, art I, § 12). The second was that the “right of the people” must also be protected against the arbitrary exercise of the search and seizure power — most concretely embodied in the mandate that a warrant not only be supported *361 by probable cause, but also “particularly describ[e]” the places, persons or things to be seized or searched (US Const Amend IV; NY Const, art I, § 12).
In his 1974 Holmes lecture Perspectives on the Fourth Amendment (58 Minn L Rev 349, 410-412), Professor Anthony G. Amsterdam explained that the Framers’ intent was to prohibit a two-fold indiscriminateness characteristic of the colonial general warrants and writs of assistance. Their evils were:
“[F]irst * * * that they expose people and their possessions to interferences by government when there is no good reason to do so. The concern here is against unjustified searches and seizures * * *. [S]econd is that indiscriminate searches and seizures are conducted at the discretion of executive officials, who may act despotically and capriciously in the exercise of the power to search and seize. This latter concern runs against arbitrary searches and seizures: it condemns the petty tyranny of unregulated rummagers” (id., at 411 [emphasis in original]).[1]
The modern Fourth Amendment jurisprudence of the Supreme Court expressly recognizes the centrality of the second function of the Fourth Amendment: to safeguard against arbitrarily exercised personal and property intrusions. Thus, in Wolf v Colorado (338 US 25, overruled on other grounds by Mapp v Ohio, 367 US 643), where the Fourth Amendment was first imposed upon the States by incorporation into the Fourteenth Amendment’s Due Process Clause, the Court stated: “The security of one’s privacy against arbitrary intrusion by the police — which is at the core of the Fourth Amendment — is basic to a free society” (id., at 27 [emphasis supplied]).
In Camara v Municipal Ct. (387 US 523, 528), the Court repeated: “[t]he basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials” (emphasis supplied). In Camara, the Court struck warrantless nonemergency administrative housing code inspections on the principal ground that *362 “[t]he practical effect of this system is to leave the occupant subject to the discretion of the official in the field” (id., at 532 [emphasis supplied]).
In a series of decisions dealing with various configurations of vehicle stops on the public highways, the Supreme Court repeatedly emphasized the critical concern of whether the police procedures at issue subjected motorists “to potentially unlimited interference with their use of the highways, solely at the discretion of * * * officers” (United States v Brignoni-Ponce, 422 US 873, 882 [emphasis supplied]). Thus, in Delaware v Prouse (440 US 648), the Court held that random police stops for license and registration checks violated the Fourth Amendment. The Court emphasized that “[t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed” (id., at 661 [emphasis supplied]).
This Court, in applying the identical language of the first paragraph of article I, § 12 of the State Constitution, has afforded citizens even greater protections in order to fulfill the underlying constitutional purpose of preventing not only unsupported searches and seizures, but also the arbitrary exercise of lawful authority to seize or search. As noted in a comprehensive study of State constitutional search and seizure jurisprudence, “New York decisions are guided by the general constitutional policy reflected by Article one, Section twelve rather than the literal meaning of the constitutional language. That policy is to guarantee personal privacy, bodily integrity, property interests and freedom of movement against arbitrary and unjustified intrusions in the nature of searches and seizures by the government” (Pitler, Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals’ Quest for Principled Decision making, 62 Brook L Rev 1, 282-283 [emphasis supplied; footnotes omitted]).
In the context of automobile searches and seizures, we have held that “the State Constitution protects the privacy interests of the people of our State * * * against the unfettered discretion of government officials to search or seize” (People v Belton, 55 NY2d 49, 52 [emphasis supplied]). And in People v Galak (80 NY2d 715) we invalidated an inventory search of a vehicle and suppressed its fruits, under both the Fourth Amendment and article I, § 12, because “[t]he police department policy governing the search failed to generate a meaningful inventory of the vehicle’s contents and allowed the officer conducting the search undue discretion” (id., at 716-717 [emphasis supplied]).
*363 II.
The majority, following the Supreme Court’s decision in Whren, concludes that even an admittedly pretextual traffic stop meets State constitutional standards if the officer had probable cause to believe the traffic code had been violated. Concededly, the first prophylactic purpose of both Federal and State constitutional search and seizure provisions — to prevent unjustified governmental invasions of personal liberty and privacy — is satisfied when a traffic stop is based upon probable cause that an infraction was committed. Moreover, with respect to warrantless arrests for violations of the State’s criminal laws (rather than its traffic code), an individualized determination of probable cause will generally provide an objective evidentiary floor circumscribing police conduct, thereby satisfying the second purpose of the Fourth Amendment and article I, § 12 — the prevention of arbitrary exercises of governmental authority to search or seize.
Yet in the context of pretextual traffic stops — traffic infraction stops that would not have been made but for the aim of the police to accomplish an otherwise unlawful investigative seizure or search — the existence of probable cause that the infraction was committed is manifestly insufficient to protect against arbitrary police conduct. That is so for two reasons. First, motor vehicle travel is one of the most ubiquitous activities in which Americans engage outside the home.[2] Second, it is, by an overwhelming margin, the most pervasively regulated activity engaged in by Americans. Because virtually every aspect of the operation and equipping of motor vehicles is codified, the Whren petitioners’ assertion — that “[s]ince * * * the use of automobiles is so heavily and minutely regulated that total compliance with traffic and safety rules is nearly impossible, a police officer will almost invariably be able to catch any given motorist in a technical violation” — was so self-evidently true that it went unchallenged (Whren v United States, supra, 517 US, at 810).
The confluence of the foregoing factors — the dependency of the vast majority of Americans upon private automobile *364 transportation and the virtual impossibility of sustained total compliance with the traffic laws — gives the police wide discretion to engage in investigative seizures, only superficially checked by the probable cause requirement for the traffic infraction that is the ostensible predicate for the stop. The Whren Court did not address the fact that arbitrary investigative seizures — in violation of a core value of the Federal and State search and seizure constitutional order — are permitted if pretextual stops can be justified solely on the basis of the existence of probable cause to issue a traffic infraction ticket.
Sadly, the pretext stop decisions in lower State and Federal courts confirm that the traffic infraction probable cause standard has left the police with the ability to stop vehicles at will for illegitimate investigative purposes. Typically, the stops are conducted as part of a drug interdiction program by a law enforcement agency. The vehicle and occupants appear to fit within a “drug courier” profile and the driver or occupants may have engaged in some other innocuous behavior which arouses a surmise of criminal conduct. The officer then follows the vehicle until some traffic code violation is observed. At that point, or even later, the vehicle is pulled over and the officer proceeds with the investigation. All occupants may be directed to exit the vehicle (see, Maryland v Wilson, 519 US 408; People v Carvey, 89 NY2d 707); the driver also may be interrogated and asked to consent to a search of the vehicle.
That pattern was reflected in United States v Smith (80 F3d 215 [7th Cir]), in which the suspected drug courier was followed for 0.7 miles and then stopped for an air freshener hanging from the vehicle’s rearview mirror. In United States v Miller (821 F2d 546, 547 [11th Cir]), the officer’s suspicions were aroused because the car was being driven “overly cautious”; ultimately, the stop was made for crossing over the white painted lane marker by four inches during an interval of 6.5 seconds. In United States v Hill (195 F3d 258, 261 [6th Cir], cert denied 528 US 1176), a sheriffs deputy decided to follow a U-Haul truck driven completely lawfully “because it was a U-Haul, and because it had been his experience that U-Hauls carry narcotics,” until, after almost a mile, a speeding violation was detected. The Fifth Circuit, in United States v Roberson (6 F3d 1088, 1092, cert denied 510 US 1204, sub nom. Keeper v United States, 511 US 1010, sub nom. Whitlock v United States, 510 US 1182), described the career of the arresting officer in that case as follows:
*365 “It appears that in the past five years, Trooper Washington has arrested 250 people on drug charges, all after trafile stops. Of those, only four were warrant-authorized. Indeed, this court has become familiar with Trooper Washington’s propensity for patroling the fourth amendment’s outer frontier.”
In Roberson, the trooper, pursuing a speeder, passed the defendants’ van, which displayed out-of-state license plates and was occupied by four African Americans. Abandoning the pursuit of the other car, the trooper crested a hill, pulled onto the shoulder of the highway, doused his lights and activated his radar gun as the van approached. The van was found to be traveling only three miles per hour over the speed limit. However, in changing lanes to avoid the risk of contact with the trooper’s car, the driver failed to signal, although the van was “apparently the only moving vehicle on that stretch of road” (id., at 1089). The trooper made the stop for that infraction. The drug possession conviction in Roberson was upheld on the ground that the officer had probable cause for the failure-to-signal infraction.
New York pretext stop cases reveal the same pattern. For example, in People v Laws (213 AD2d 226, lv denied 85 NY2d 975), the defendant’s vehicle was observed parked in front of a suspected “narcotics location,” and was subsequently pulled over for a broken taillight (see also, People v Young, 241 AD2d 690 [driver stopped by plainclothes State Police investigator for failure to signal]; People v Letts, 180 AD2d 931, appeal dismissed 81 NY2d 833 [driver stopped by plainclothes State Police investigator for failure to come to a complete stop at a stop sign]).
The impact of the Whren standard cannot be overstated: *366 Indeed, even one member of the unanimous Whren Court has belatedly recognized that Whren’s endowment of the police with unlimited power to conduct vehicle stops, when combined with the further authority to order all occupants to exit the vehicles, substantially impacts the personal liberty and privacy of myriad citizens, most of whom will be innocent of any criminal conduct:
*365 “With automobiles serving as the common denominator in our society, probable cause, reasonable suspicion, and other Fourth Amendment-type safeguards have, for all practical purposes, disappeared from large parts of our public and private lives. Thus no matter how incremental the legal changes brought about by each car case ha[ve] been, the big picture has been altered, and dramatically so. And this affects the lives of all Americans— not just those who are stopped frequently, but every person who could be” (Harris, Car Wars: The Fourth Amendment’s Death on the Highway, supra, 66 Geo Wash L Rev, at 577-578).
*366 “The practical effect of our holding in Whren, of course, is to allow the police to stop vehicles in almost countless circumstances. When Whren is coupled with today’s holding, the Court puts tens of millions of passengers at risk of arbitrary control by the police” (Maryland v Wilson, supra, 519 US, at 423 [Kennedy, J., dissenting]).
Moreover, as has been repeatedly documented, and as the majority acknowledges, drug courier interdiction through traffic infraction stops has a dramatically disproportionate impact on young African-American males (see, Harris, Car Wars: The Fourth Amendment’s Death on the Highway, supra; Abramovsky and Edelstein, Pretext Stops and Racial Profiling After Whren v. United States: The New York and New Jersey Responses Compared, 63 Alb L Rev 725; Harris, “Driving While Black” and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J Crim L & Criminology 544; Maclin, Race and the Fourth Amendment, 51 Vand L Rev 333; Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment, 1997 Sup Ct Rev 271). Yet both the majority and the Whren Court dismiss the relevance of such disparate treatment in the constitutional search and seizure context. They instead suggest that the remedy lies in invoking the Federal Constitution’s Equal Protection Clause. The same studies that recognize the existence of a disparate racial impact, however, also demonstrate the inadequacy of the Equal Protection Clause as a remedy for those abuses. A “racial profiling claim under the Equal Protection Clause is difficult, if not impossible, to prove” (Beck and Daly, State Constitutional Analysis of Pretext Stops: Racial Profiling and Public Policy Concerns, 72 Temp L Rev 597, 612 [1999]). The Equal Protection Clause prohibits race-based selective enforcement of the law only when such enforcement “ ‘had a discriminatory effect and * * * was motivated by a discriminatory purpose’ ” (United States v Armstrong, 517 US 456, 465). Of course, “[i]t is easy for an accused to allege that she was subjected to police interference based on race, but it is difficult to support the allegation” (Beck and Daly, supra, at 612).
*367 Moreover, the problems of proof in establishing an equal protection claim may be all but insurmountable. Putting aside the unquestionably expensive and time-consuming process of assembling statistical evidence, it is debatable whether the requisite data would even be available (see, Beck and Daly, supra, at 613). Supreme Court precedent also suggests that minority motorists alleging that a pretextual traffic stop constituted a denial of equal protection must show that similarly situated white motorists could have been stopped, but were not (see, United States v Armstrong, supra, 517 US, at 465; see also, Davis, Race, Cops, and Traffic Stops, 51 U Miami L Rev 425, 437-438). These hardly show that equal protection challenges constitute a viable remedy for the disparate racial impact of pretextual traffic stops.
III.
While practical considerations may favor State-Federal uniformity in setting constitutional standards governing law enforcement practices, we have stressed in the past that this is only one factor to be considered with others that may point in a different direction. “When weighed against the ability to protect fundamental constitutional rights, the practical need for uniformity can seldom be a decisive factor” (People v P. J. Video, 68 NY2d 296, 304, cert denied 479 US 1091). We have not hesitated to deviate from Federal Fourth Amendment jurisprudence when we have concluded that it does not adequately secure the fundamental rights of privacy under article I, § 12 of our own Constitution (see, People v Scott, 79 NY2d 474; People v Keta, 79 NY2d 474, 491; People v Dunn, 77 NY2d 19, cert denied 501 US 1219), or when changing Federal standards undermine the “aims of predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens” (People v Johnson, 66 NY2d 398, 407; see also, People v Griminger, 71 NY2d 635). Especially pertinent here, we have found reason to impose stricter requirements under our own Constitution in search and seizure cases involving automobiles and their occupants (see, People v Torres, 74 NY2d 224; People v Class, 67 NY2d 431).
We conclude that various factors strongly weigh against adopting Whren and in favor of imposing a stricter standard as a matter of State constitutional law in cases involving pretextual traffic stops.
First, while we have not directly held that the fruits of a pretextual stop should be suppressed, on no less than six occa *368 sions, most of which involved automobile searches or seizures, our Court “has voiced disapproval of, and appears to have enunciated principles to address, pretextual police conduct” (Pitler, supra, 62 Brook L Rev, at 283; see, People v Spencer, 84 NY2d 749, 753, cert denied 516 US 905; People v Woods, 64 NY2d 736, 737; People v Gonzalez, 62 NY2d 386, 391; People v Prochilo, 41 NY2d 759, 761-762; People v Hansen, 38 NY2d 17, 21, overruled on other grounds by People v Ponder, 54 NY2d 160; People v Troiano, 35 NY2d 476, 477). Additionally, for over two decades Appellate Division case law has directly condemned pretextual traffic stops (see, e.g., People v Flanagan, 56 AD2d 658) and that position was ultimately adopted by all four Departments before Whren was handed down (see, e.g., People v Ynoa, 223 AD2d 975, lv denied 87 NY2d 1027, sub nom. People v Rodriguez, 87 NY2d 1024 [3d Dept]; People v James, 217 AD2d 969 [4th Dept]; People v Vasquez, 173 AD2d 580, lv denied 78 NY2d 1130 [2d Dept]; People v Watson, 157 AD2d 476, appeal dismissed sub nom. People v Flo, 75 NY2d 966, sub nom. People v Smiley, 75 NY2d 970, lv denied 75 NY2d 971 [1st Dept]). The trial courts also followed suit (see, Kamins, New York Search & Seizure, at 373-378 nn 195-197, 199 [11th ed]). Thus, adoption of the Whren position will overturn a substantial body of New York case law denying State and local law enforcement agencies the fruits of pretextual traffic stops.
Moreover, as the Whren decision acknowledges, the Supreme Court itself previously indicated in a number of cases that pretext could be a highly significant negative factor in various Fourth Amendment contexts (see, Florida v Wells, 495 US 1, 4; New York v Burger, 482 US 691, 716-717 n 27; Colorado v Bertine, 479 US 367, 372; Colorado v Bannister, 449 US 1, 4 n 4; Abel v United States, 362 US 217, 227).
Above all, however, Whren should not be followed because it does not demonstrate that its traffic infraction probable cause standard adequately protects the constitutional rights of motorists on the highways from arbitrarily exercised police powers to seize and search. Most of the Whren decision is devoted to showing why the Court rejected the standard advocated by the petitioners in that case. They had urged the adoption of an objective standard by which to judge police exploitation of arbitrary traffic code enforcement to conduct investigative stops: whether a reasonable police officer, under the circumstances, would have made the stop for the reasons given. Despite the objective nature of that test, the Supreme Court’s pri *369 mary reason for rejecting it was that it was “driven by subjective considerations” — that is, the improper motivation of the seizing officer to conduct an otherwise unjustified investigative stop (517 US, at 814). Therefore, the Court concluded, the petitioners’ standard conflicted with a body of search and seizure jurisprudence holding that an officer’s state of mind is irrelevant if the objective circumstances show that the officer’s conduct was reasonable.
This criticism, in our view, misses the mark. The petitioners in Whren claimed that the officers’ seizure was unreasonable because it was arbitrary, not because it was either unjustified or improperly motivated. They suggested that the determination whether the stop was in fact an arbitrary exercise of the power to enforce the traffic laws should be subject to an objective test, that is, by consideration of the stop’s deviation from the norm.
The Whren petitioners’ standard is indistinguishable from the objective test in Terry v Ohio (392 US 1) for determining the reasonableness of an investigative stop and frisk, or the objective test for reasonableness of a law enforcement officer’s exploratory manipulation of a bus passenger’s luggage in an overhead rack in Bond v United States (529 US 334). Just as the ulterior motives of the police in Terry and Bond were not dispositive, those of the seizing officers in Whren would not be decisive under the test advanced by the petitioners in that case.
The Whren Court offered only two other reasons for rejecting the test suggested by the petitioners. The first was that “police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable * * * and can be made to turn upon such trivialities” (517 US, at 815). Under well-established Federal and State search and seizure doctrine, however, the validity of a search may indeed turn upon differences in police practices from one jurisdiction to another. Thus, as already discussed, whether a vehicle inventory search is upheld may depend on the adoption by the local police agency of rules limiting the discretion of the officer in conducting such searches (see, People v Galak, supra, 80 NY2d 715; South Dakota v Opperman, 428 US 364). Moreover, the basic determination of reasonable suspicion or even probable cause to support a search or seizure will almost always “vary from place to place and from time to time,” depending on the particular circumstances confronting an officer.
*370 Whren also claimed in substance that accepting petitioners’ position would place Judges in the role of deciding what traffic code provisions are to be enforced at all:
“But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement” (517 US, at 818).
Adoption of the standard urged by the petitioners in Whren would do nothing of the sort. It does nothing more than set an objective standard, the violation of which would deprive law enforcement officers only of the use of evidence of crimes unrelated to the traffic infraction obtained in investigative stops effected through arbitrary enforcement of the traffic laws. As to the infraction itself, as with criminal investigations, the probable cause standard basically works adequately to satisfy both of the dual purposes of constitutional search and seizure law for officers solely pursuing violations while authentically engaged in traffic code enforcement. In those situations, prosecution of the underlying traffic infraction is not based upon evidence obtained through exploitation of the initial stop, but upon observations made before the stop. We find it noteworthy that of the manifold pretextual stops reviewed in the decisions in Federal and state courts nationwide, none directly addressed suppression of the prosecution of the traffic violation that supported the stop.
The pretext stop cases also demonstrate that the existence of probable cause with respect to the traffic infraction is not sufficient to forestall arbitrary exploitation of the violation in order to conduct otherwise unjustified investigative stops. It is the failure of Whren even to address that issue that is the most cogent reason for not following it. It is not without significance that Whren has been the subject of a plethora of criticism in texts and articles, expressing concern that the decision marked the removal of the protection of the Fourth Amendment from the highways. Reading them, one would be hard put to agree with the Whren Court that if a heightened standard of scrutiny of pretextual stops were adopted, enforcement of the Fourth Amendment would be “made to turn upon * * * trivialities” (id., at 815), and that Whren itself was “surely” nothing more than a “run-of-the-mine case” (id., at 819). Citations to those critiques are set forth in an Appendix to this writing.
*371 IV.
Next to be addressed on these appeals is the standard we would adopt to determine whether the stops in these cases were pretextual and, thus, in violation of defendants’ State constitutional rights to be free from arbitrary invasions of their liberty and privacy.
Defendants urge that we adopt a subjective test, whether the “primary motivation” for the stop was to investigate criminal activity rather than to prosecute the traffic offense ostensibly justifying the seizure.[3] We would reject that test in favor of a more objective standard, for several reasons. First, courts and commentators have noted the difficulty, if not futility, of basing the constitutional validity of searches or seizures on judicial determinations of the subjective motivation of police officers. As stated by Justice White, “sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources” (Massachusetts v Painten, 389 US 560, 565 [White, J., dissenting]; see also, Amsterdam, supra, 58 Minn L Rev, at 436-437; 1 LaFave, supra, § 1.4 [e], at 124). Second, even if one could accurately discern a seizing officer’s subjective motives, the resulting adjudication might not at all correlate with the constitutional objective at issue, to prevent exercises of the power to search or seize that are unreasonable in the sense of being arbitrary, standardless and inconsistent.
Thus, we prefer an objective standard similar to that adopted by the Ninth and Eleventh Circuits before Whren and urged by the petitioners in Whren itself.[4] That is, would a reasonable of *372 ficer assigned to Vehicle and Traffic Law enforcement in the seizing officer’s department have made the stop under the circumstances presented, absent a purpose to investigate serious criminal activity of the vehicle’s occupants. Whether the stop was carried out in accordance with standard procedures of the officer’s department would be a highly relevant inquiry in that regard (see, 1 LaFave, supra, at 124).
In People v Robinson and People v Glenn, the courts below erred in applying the traffic violation/probable cause standard of Whren to uphold the seizures of evidence in those cases. In People v Reynolds, the courts below erred in applying essentially a primary motivation standard to suppress evidence acquired through the stop. Thus, we would reverse in all three cases and remit in each to the trial court to reopen the hearing and decide the suppression motion under the constitutionally appropriate standard.
Before concluding, we respond to the discussion of this dissent in the majority writing. The majority contends that we have “no valid basis * * * to bifurcate” examination of probable cause to believe a traffic infraction occurred and of the arbitrariness of a pretextual stop because “[pjrobable cause * * * has been equated with the sum of the requirements of the State and Federal Constitutions in this area” (majority opn at 353). Thus, to the majority, the existence of probable cause to stop for a traffic code violation would preclude any inquiry into *373 whether the stop nonetheless was unreasonable as an arbitrary-seizure for unjustified investigative purposes.
The “basis” for our contrary position lies, first, in the language of the Federal and State constitutional provisions. As we have noted, even in the most presumptively valid exercise of the search and seizure power — under a search warrant— probable cause to support that exercise is not enough. The warrant must also contain restrictive language “particularly describing” the persons, places and things to be seized or searched. That clause would be excised under the majority’s thesis that the existence of probable cause satisfies all constitutional requirements. Preeminent scholars cite that text and the constitutional history to contradict the majority’s conclusion that probable cause equates with the constitutional validity of a search or seizure: Thus, Professor Amsterdam stated that “even when there is sufficient cause to intrude upon an individual * * * the framers decreed that it was unreasonable * * * to subject his premises or possessions to indiscriminate [i.e., arbitrary] seizure” (supra, 58 Minn L Rev, at 411 [emphasis supplied]; see, 1 LaFave, Search and Seizure § 1.4 [e], at 119-122, and 2002 Pocket Part, at 16, supra).
Treating as a concession our statement that for criminal law violations the probable cause standard generally will prevent arbitrary seizures, the majority argues that our contrary conclusion respecting traffic stops lacks any basis (majority opn at 355). The distinction is based on both principle and cold fact. As we have documented, a persevering police officer, armed only with a copy of the Vehicle and Traffic Law and bent on subjecting a vehicle and its occupants to an unjustified investigative stop, will ultimately be able to accomplish that objective virtually at will. As the Appendix to this writing shows, the research of numerous legal scholars confirms that reality. Candid officers, aware of their power under a probable cause/traffic infraction standard, freely admit to it (see, Harris, supra, 66 Geo Wash L Rev, at 567-568).
The majority assures us, however, that such abuses can be cured or mitigated by judicial control over the “scope, duration and intensity of the seizure” and any subsequent search (majority opn at 353). Our case law permits the stopping officer, among other things, to open the passenger door; make outside visual inspections, including shining a flashlight into the interior of the vehicle; order the driver and all occupants out; and detain the vehicle and its occupants for purposes of verification of license, registration and insurance information *374 (see, Kamins, New York Search & Seizure, supra, at 382-384, 390-392). These are severe, and mostly standardless intrusions upon the liberty of motorists and their passengers, which are already authorized upon a stop for even a minor traffic violation, and which no amount of subsequent judicial regulation will prevent. As Justice Kennedy later observed, those intrusions can be imposed arbitrarily under the Whren standard upon “tens of millions” of highway users (519 US, at 423).
The remainder of the majority’s discussion of the dissenters’ position here is devoted to a critique of the objective standard we would adopt for determining whether evidence seized following a pretextual traffic stop should be suppressed.
The majority’s principal criticism of the reasonable police officer standard we support raises the same spectre as the Supreme Court did in Whren, that the standard will lead to piecemeal judicial abrogation of enforcement of our State’s traffic code. The majority does not persuasively address our earlier analysis explaining why a standard to deny police evidence seized in arbitrary investigative stops for traffic offenses will not preclude prosecution of such offenses.
But again, experience confirms the correctness of our position. Before Whren, the holdings of Federal and State courts covering 22 states, including California, Florida and New York — three of the four most populous — consistently or for a period of time held that a probable cause/traffic infraction standard was insufficient, and applied a stricter test for adjudging pretextual stops.[5] Yet there is a dearth of authority in which traffic violations have been dismissed on the ground that the stops were pretextual. To us this indicates that Whren’s concern is more theoretical than real.
We remain to reverse and remit for reopened hearings with instruction to apply the appropriate objective standard by the suppression court to the traffic stops in all three of the cases before us.
Judges Wesley, Rosenblatt and Graffeo concur with Judge Smith; Judge Levine dissents and votes to reverse and remit to Supreme Court in a separate opinion in which Chief Judge Kaye and Judge Ciparick concur.
In People v Robinson and People v Glenn: Order affirmed.
Judges Wesley, Rosenblatt and Graffeo concur with Judge Smith; Judge Levine dissents and votes to reverse and remit
*375 to Rochester City Court for a reopened suppression hearing in a separate opinion in which Chief Judge Kaye and Judge Cipaeick concur.
In People v Reynolds: Order reversed, defendant’s motion to suppress denied, the accusatory instruments reinstated and the case remitted to Rochester City Court for further proceedings in accordance with the opinion herein.

. The arbitrariness of the writs of assistance was denounced in a famous prerevolutionary speech by Boston patriot James Otis, in that they placed the “liberty of every man in the hands of every petty officer” (quoted in Boyd v United States, 116 US 616, 625, and Payton v New York, 445 US 573, 583 n 21).

. Harris, Car Wars: The Fourth Amendment’s Death on the Highway (66 Geo Wash L Rev 556, 576 [1998]) observed that “America is virtually saturated with vehicles, roads, and licensed drivers.” Harris cites United States Commerce Department statistics that almost 100 million Americans drive daily to work in private vehicles; virtually 9 out of 10 Americans of driving age are licensed to drive; and by 1990 only 11.5% of American households did not own at least one vehicle (id., at 576-577 and nn 138-140, 148).

. That standard has been applied by the lower courts in deciding pretextual stop cases (see, People v Washington, 238 AD2d 43, 50, lv denied 91 NY2d 1014). In large part, however, objective criteria have been used to determine the officers’ motivations (see, id.).

. (See, United States v Cannon, 29 F3d 472 [9th Cir]; United States v Smith, 799 F2d 704 [11th Cir].) The Tenth Circuit in United States v Guzman (864 F2d 1512) had also adopted the reasonable police officer objective test. However, a divided Tenth Circuit en banc court in United States v Botero-Ospina (71 F3d 783, cert denied 518 US 1007) overruled Guzman and upheld pretextual traffic stops so long as the seizing officer had probable cause to believe a traffic infraction had been committed. Before the Whren decision, several State courts also employed this “reasonable officer” test as a matter of Federal constitutional law (see, e.g., Kehoe v State, 521 So 2d 1094 [Fla]; Mings v State, 318 Ark 201, 210, 884 SW2d 596, 602; State v Haskell, 645 A2d 619, 621 [Me]; Alejandre v State, 111 Nev 1235, 903 P2d 794; State v Chapin, 75 Wash App 460, 468, 879 P2d 300, 304-305, review denied 125 Wash 2d 1024, 890 P2d 465; Limonja v Commonwealth, 8 Va App 532, 538, *372 383 SE2d 476, 480, cert denied 495 US 905; People v Guerrieri, 194 Ill App 3d 497, 551 NE2d 767, lv denied 132 Ill 2d 549, 555 NE2d 380; see also, Simmons v State, 223 Ga App 781, 782, 479 SE2d 123, 124).
We do not quarrel with the majority’s demonstration that, after Whren, most State courts adopted its probable cause/traffic infraction standard, or that, even before Whren, the prevailing view among the Federal circuits was to reject the “reasonable officer” test in favor of the probable cause test ultimately adopted in Whren. By no means was the view unanimous, however. Even in those courts that rejected the “reasonable officer” standard, Federal Judges continued to recognize the arbitrary deprivation of personal liberty that the probable cause standard permits. In Botero-Ospina (71 F3d, at 795), cited in the majority opinion (at 357), Judge Lucero, joined by Chief Judge Seymour and Judge Henry, dissented, stating: “I do not question the depth of the frustration which drives my colleagues in the majority to abandon the reasonable officer standard * * *. Nevertheless, their action will not stand the test of time, and it does not pass constitutional scrutiny today.” Similarly, in United States v McCully (21 F3d 712, 714 [6th Cir], cert denied 513 US 886), Judge Jones, concurring, stated: “On the basis of [United States v Ferguson, 8 F3d 385 (cited in the majority opn at 357 n 7)], I must vote to affirm McCully’s conviction. However, I continue to believe that our decision in that case represents an abdication of our duty to provide citizens the security to travel without unreasonable police stops and searches, as guaranteed by the Fourth Amendment.”

. See cases supra at 371-372 n 4.