Kevin McKENZIE, a/k/a Keith Barrett *v.*
STATE of Arkansas

CR 03-775 208 S.W.3d 173

Supreme Court of Arkansas
Opinion delivered May 12, 2005

Leah Chavis, for appellant.

Mike Beebe, Att'y Gen., by: Misty Wilson Borkowski, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant Kevin McKenzie was convicted of possession of marijuana and cocaine with intent to deliver and was sentenced to a total of sixty years' imprisonment. The court of appeals certified McKenzie's appeal to this court because the appeal presents an issue needing clarification or development of the law regarding the constructive possession of contraband. See Ark. Sup. Ct. R. 1-2(b)(5).

In his first point on appeal, McKenzie argues that the trial court erred in denying his directed-verdict motion because the evidence was insufficient to demonstrate beyond a reasonable doubt that McKenzie constructively possessed the contraband. In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence, direct or circumstantial. Garner v. State, 355 Ark. 82, 131 S.W.3d 734 (2003); Polk v. State, 348 Ark. 446, 73 S.W.3d 609 (2002). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. Id. We view the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. Id. Circumstantial evidence provides the basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. Id.

We have explained that, in constructive possession cases, the State need not prove that the accused physically pos-

sessed the contraband in order to sustain a conviction for possession of a controlled substance if the location of the contraband was such that it could be said to be under the dominion and control of the accused. *George v. State*, 356 Ark. 345, 147 S.W.3d 691 (2004). Constructive possession may be established by circumstantial evidence. *Polk, supra*. When seeking to prove constructive possession, the State must establish that the defendant exercised care, control, and management over the contraband. *Id.* This control can be inferred from the circumstances, such as the proximity of the contraband to the accused, the fact that it is in plain view, and the ownership of the property where the contraband is found. *George, supra*; *Nichols v. State*, 306 Ark. 417, 815 S.W.2d 382 (1991).

■■ Further, while this court does not appear to have addressed this particular question in the context of a driver of an eighteen-wheel tractor-trailer, we have opined that joint occupancy of an ordinary vehicle (such as a car) standing alone, is not sufficient to establish possession or joint possession. *Mings v. State*, 318 Ark. 201,884 S.W.2d 596 (1994). There must be some other factor linking the accused to the drugs. *Id.* Other factors to be considered in cases involving automobiles occupied by more than one persons are: (1) whether the contraband is in plain view; (2) whether the contraband is found with the accused's personal effects; (3) whether it is found on the same side of the car seat as the accused was sitting or in near proximity to it; (4) whether the accused is the owner of the automobile, or exercises dominion and control over it; and (5) whether the accused acted suspiciously before or during the arrest. *Id.*; *see also Plotts v. State*, 297 Ark. 66, 759 S.W.2d 793 (1988). Constructive possession may be established by circumstantial evidence, but when such evidence alone is relied on for conviction, it must indicate guilt and exclude every other reasonable hypothesis. *Hodge v. State*, 303 Ark. 375, 797 S.W.2d 432 (1990).

The evidence presented during the State's case-in-chief at McKenzie's trial was as follows: On September 23, 2001, Officer Greg Toland of the Arkansas Highway Police was working at a weigh station in Crawford County. Toland pulled McKenzie over for a random inspection of his truck; when McKenzie showed Toland his log book, Toland noticed that McKenzie was two hours over his permissible drive hours. Toland also saw that McKenzie's bill of lading indicated that only two pallets had been

picked up in California, which Toland thought unusual. Toland asked for consent to search the vehicle, which McKenzie granted.

McKenzie provided Toland with the key to open the trailer. When Toland and McKenzie opened the trailer, Toland noticed it was warmer than it should be, given that the bills of lading indicated that McKenzie was carrying lemons and grapefruit, which should have been stored at a temperature between thirty-seven and forty-five degrees, according to the loading sheet. After noticing the temperature, Toland saw that somebody had been on top of the load of produce, "like they had been crawling from the back to the front," and the boxes were "mashed down." Toland shone his flashlight underneath the pallets; at the very front, far end of the truck, he saw some green and black material that turned out to be duffel bags. Toland said that there was a "space on the left hand side, where you could see all the way down," and at the front, there was a stack of empty pallets.

Toland called for back-up, because McKenzie had a passenger in the cab of his truck. When Officer Jeff Smith of the Crawford County Sheriff's Department arrived, the two proceeded to the front of the trailer and started taking pallets off the top of the duffel bags; then they opened the bags and found 334.4 pounds of marijuana.[1]

Jack Stepp, assistant safety supervisor for the Arkansas Highway Police, also testified for the State. Stepp testified about drivers' responsibilities under Department of Transportation regulations, stating that "the driver is ultimately responsible for [the] load" in his trailer, and that "[w]ith respect to produce, if there is a seal and a lock on the load, the driver is responsible for putting it there," although it was not common for a shipper of produce to lock the load. It was so unusual, Stepp testified, that he could not recall ever seeing a lock on a load of produce in his fifteen years of experience. Stepp further stated that it was uncommon to have the temperature at sixty-one degrees for a load of produce, and that it was "not a common trucking practice to have a load crawled on top of because it would damage the produce." Of the five or six trucks Stepp had seen where someone had crawled on top of the produce, he said, "all of them were hauling illegal controlled substances."

---

[1] Dan Hedges, a forensic chemist at the Arkansas State Crime Lab, testified that he tested the matter removed from the truck, and it was indeed marijuana; there were also 4.26 pounds of cocaine.

We believe that this evidence, viewed in the light most favorable to the State, supports the jury's finding of guilt. As mentioned above, there have been no other Arkansas cases involving constructive possession of contraband in a tractor-trailer or eighteen-wheeler, but cases from federal courts of appeal are instructive. For example, in *United States v. Sanchez*, 252 F.3d 968 (8th Cir. 2001), the Eighth Circuit Court of Appeals affirmed a conviction for possession of marijuana with intent to deliver. In that case, the facts showed that appellant Sanchez was driving a tractor-trailer; at a weigh station, Missouri State Highway Police Officer John Adams stopped the truck and decided to perform a safety inspection. Adams became suspicious because the trailer lacked proper registration; the bill of lading indicated that Sanchez was hauling onions from Springer, Oklahoma (despite the fact that Adams had never seen produce that originated in Springer, Oklahoma); the weight on the bill of lading did not match the weight on the scales; the onions were being refrigerated, even though it was November; and the trailer was only half-full, despite Sanchez's assertions that he was traveling all the way to the east coast. In addition, Adams later testified that Sanchez appeared nervous and had a difficult time sitting still while the two spoke. *Sanchez*, 252 F.3d at 970.

A second officer arrived and asked permission to search the trailer; Sanchez gave the officer a key. When the officer looked in the trailer, he became suspicious that a false wall had been built into the trailer, because there was new metal trim that was out of keeping with the rest of the truck. Information that Sanchez gave to the officers about his trip eventually turned out to be false, such as the fact that the company for which Sanchez claimed to work indicated that they had never met Sanchez. In addition, a search of the cab turned up a Home Depot receipt that reflected the recent purchase of items consistent with those necessary to build a false compartment. *Id.* at 971.

In affirming, the Eighth Circuit held that Sanchez had sole control and dominion over the vehicle in which the contraband was discovered; Sanchez had given false and evasive answers in response to police questioning; and his testimony at trial was inconsistent with the responses he had given to police. *Id.* at 972.

In another Eighth Circuit case, that court affirmed a conviction for possession of cocaine with intent to distribute. *United States v. Johnson*, 285 F.3d 744 (8th Cir. 2002). There, appellant Johnson was stopped at a weigh station; the officer present discov-

ered that Johnson's log book was missing information for three days of his trip. The log book did reflect, however, that Johnson had stopped in El Paso, Texas, which was several hundred miles out of the way for his stated itinerary of Bakersfield, California, to "someplace in Connecticut or Maryland." The officer also noticed that the trailer was locked with a lock "of a type impervious to bolt cutters, and the truck's vent door, a small door permitting inspection of the load, was locked." *Johnson*, 285 F.3d at 746. When the officer finally got up into the back of the trailer and began moving boxes, Johnson jumped up into the truck to move the boxes around. *Id.* at 747. The officer eventually discovered forty boxes containing approximately 1,000 bricks of cocaine weighing 2,213 pounds. *Id.*

At trial, Johnson's passenger, Joseph Heck, testified that he and Johnson had moved some of the melons around "in order to create an igloo-shaped space for a load Johnson said they would add in El Paso." *Id.* at 748. Heck also testified that he saw Johnson meet with several Hispanic men in El Paso, where the men loaded forty cardboard boxes into the truck. After leaving El Paso, Heck said, Johnson made several phone calls during which Heck heard him say, "We're on time," and "She's on board." *Id.* Given all of this evidence, the Eighth Circuit concluded that the jury was presented with "ample evidence that Johnson was aware of the cocaine in the truck and was transporting it as part of an agreement to distribute it[.]" *Id.* at 750.

Similarly, in *United States v. Morales*, 854 F.2d 65 (5th Cir. 1988), the Fifth Circuit Court of Appeals held there was sufficient evidence of constructive possession to support appellant Morales's conviction, where there was testimony that Morales had dominion and control over the truck and trailer he was driving from the time he picked it up until he was stopped; further, an employee who oversaw the loading of the trailer testified that he saw no marijuana in the trailer when it was loaded, nor did he see anyone else in the trailer until Morales picked it up and drove away in it. *Morales*, 854 F.2d at 68. Thus, the court concluded, the jury could reasonably infer that the marijuana was placed inside the truck after Morales took possession of it, and that Morales had either actual or constructive knowledge of its presence. *Id.*

In the present case, McKenzie testified that he did not observe or oversee the loading of his truck, and was unaware of the presence of the contraband in the trailer he was hauling. However,

this court has made it patently clear that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, *see Garner v. State*, 355 Ark. 82, 131 S.W.3d 734 (2003), and a jury is not required to believe a defendant's self-serving testimony. *See Sera v. State*, 241 Ark. 415, 17 S.W.3d 61 (2000).

The State's evidence showed that McKenzie had the only key to a locked trailer, and the fact that the trailer was locked was very unusual, as it only contained produce. In addition, the pallets appeared to have had someone crawl over them; as McKenzie was the only person with a key to the trailer, the jury could reasonably have concluded that McKenzie was the person who crawled on the fruit to reach the contraband at the far end of the trailer. Further, McKenzie's testimony that he did not oversee the loading of the trailer was contradicted by the State's evidence that it was an established industry practice for the driver of a truck to observe the loading of his trailer. A defendant's improbable explanation of suspicious circumstances may be admissible as proof of guilt. *See Baughman v. State*, 353 Ark. 1, 110 S.W.3d 740 (2003); *Stephens v. State*, 328 Ark. 81, 941 S.W.2d 411 (1997). In sum, we conclude in this constructive possession case that the State proved other factors linking McKenzie to the contraband, and we therefore reject his challenge to the sufficiency of the evidence.

In McKenzie's second point on appeal, he argues that the trial court erred in allowing the State to leave the marijuana out in the open during the trial. After the jury was selected for McKenzie's trial, the court asked counsel if there was "anything that needs to be taken up" before opening arguments began. McKenzie's attorney replied, "[W]e've got to find a place to put all this marijuana because, you know, obviously, it's permeating the air because of the fact that it's open." Counsel further objected on the grounds that the strong odor would "give the jury the impression that that's the condition it was in when it . . . was discovered, and that's not true." The court stated that it "[didn't] see any problem with it. It can stay where it is. I need to get on with the trial."

During trial, Dan Hedges of the State Crime Laboratory testified that the packages of marijuana were not open when they were delivered to his laboratory, and that the odor was caused by the "terpenes coming off the plant material." Hedges noted that when the packages were sealed up, "some people would smell

something, and some people wouldn't. Some people probably wouldn't smell a thing." Just after Hedges's testimony, the court called the attorneys to the bench, whereupon the following colloquy occurred:

> COURT: Is any juror — I noticed some were using tissues. Is any of the jurors having trouble with the smell?

> JUROR: I can't smell anything. I've got allergies; that might be the reason.

> COURT: When we take a break, I'd like for it to be removed. If they're not having an immediate problem, I'll leave it here. At the break, let's have it moved out.

On appeal, McKenzie argues that the trial court abused its discretion in allowing the marijuana to remain in the courtroom during the trial. He asserts that the State's entire theory was based on constructive possession, and suggests that the jury could have reasoned, based on the very strong smell in the courtroom, that McKenzie must have been able to smell the marijuana in the truck and, thus, have knowledge of its presence. The State responds that the marijuana was not, as McKenzie asserts, in the courtroom for the "entire first day of trial," pointing out that the record shows it was brought into the courtroom at 2:15 p.m. and was removed during a break between 4:45 and 5:00 p.m. The State further suggests that this was not an improper tactic, but was instead a critical element of the prosecution's case, as three of the State's four witnesses directly testified about the marijuana.

There is no reported Arkansas case involving the odor of marijuana in the courtroom. McKenzie relies on *United States v. Garcia*, 986 F.2d 1135 (7th Cir. 1993), in which the Seventh Circuit Court of Appeals held that the trial court erred in allowing containers of marijuana to "remain open and emit the odor of marijuana during the defendant's case in chief"; the court noted that the problem was compounded by the fact that "the odor of marijuana in the truck's cab was a key issue." *Garcia*, 986 F.2d at 1142. The court opined that the government's refusal to close the containers appeared to be "no more than an effort to produce a condition which supported its theory of guilt[.]" *Id.*

However, when the *Garcia* case was remanded to the federal district court, that court noted that it was "disturbed" by the Seventh Circuit's ruling regarding the odor of marijuana.

*United States v. Garcia*, 818 F. Supp. 238 (C.D. Ill. 1993). The district court wrote that it had presided over the trial and could "categorically state that there was no 'strong, pungent odor of marijuana' pervading the courtroom," *Garcia*, 818 F. Supp. at 240, and criticized Garcia for having "dissembled" and "misrepresented" to the appellate court that the odor of marijuana permeated the courtroom. *Id.* The court also pointed out that Garcia did not object to the introduction of the physical evidence, and that marijuana, as a piece of evidence, was more probative than prejudicial. *Id.* Given the district court's clarifications of the facts of the *Garcia* case, McKenzie's reliance on the Seventh Circuit's ruling is inapposite.

Other state and federal courts have held that it is not error to permit open containers of marijuana to remain in the courtroom during trial. In *United States v. Ramos Rodriguez*, 926 F.2d 418 (5th Cir. 1991), the Fifth Circuit Court of Appeals held that the presence of 227 pounds of marijuana in the courtroom during trial was neither a violation of Fed. R. Evid. 403 nor a due process violation, as the marijuana remained in the courtroom no more than four hours, and there was no evidence that the government had acted in bad faith. In *United States v. Dunn*, 961 F. Supp. 249 (D. Kan. 1997), a federal district court held that the odor of marijuana in the courtroom did not prejudice the defendant, where the marijuana had been properly admitted into evidence, and the defendant was able to argue to the jury that there was a difference in the "odor-producing circumstances of the marijuana's presence in the courtroom and its presence, wrapped in trash bags, in the trunk of a new, full-sized car." *Dunn*, 961 F. Supp. at 252. Finally, in *Kalinosky v. State*, 414 So.2d 234 (Fla. Ct. App. 1982), a Florida court of appeals held that there was no merit to Kalinosky's argument that his attorney had been rendered ill by the odor of the marijuana; the court did, however, "caution that the trial court and counsel should be continually conscious of maintaining a proper atmosphere of judicial decorum in the courtroom." *Kalinosky*, 414 So.2d at 235.

 We cannot say that the presence and alleged odor of the marijuana in the courtroom during McKenzie's trial was unduly prejudicial. Only one juror responded to the court's question about jurors' using tissues, and that juror said that he had allergies and could not smell anything. Further, contrary to McKenzie's assertion in his brief, the forensic chemist did not specifi-

cally testify that the "marijuana odor" in the courtroom was "quite potent." As noted above, Dan Hedges testified that the odor in the courtroom was caused by the "terpenes," which were "quite potent." In any event, the court had the marijuana removed from the courtroom at the end of the testimony of the three witnesses who had been in contact with the marijuana. As such, there was no abuse of discretion in allowing the marijuana to stay in the courtroom during the first two and a half hours of the trial.

The final argument in this appeal concerns the prosecutor's cross-examination of McKenzie and his closing arguments to the jury. Although McKenzie acknowledges that his attorney never objected to either the cross-examination or the closing arguments, he contends on appeal that the prosecutor's errors were so flagrant and highly prejudicial in character as to have required the trial court to intervene on its own motion and admonish the jury to disregard the prosecutor's comments.

Before discussing the application of the so-called *Wicks* exceptions to our contemporaneous objection rule, *see Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), we set out the prosecutor's objectionable comments in their entirety. During the State's cross-examination of McKenzie, the two following sets of questions occurred — the first involved McKenzie's mother, and the second dealt with McKenzie's knowledge of the policies of the fruit-packing companies for whom McKenzie was driving. Prosecutor Marc McCune's exchange with McKenzie about his mother was as follows:

Q: You've testified that you were a law enforcement officer.

A: Law enforcement, yes.

Q: Would it surprise you if your mom said you were not in law, never were in law enforcement?

A: My mom could never tell you that.

Q: Your mom told me that.

A: My mom could never tell you that.

Q: Your mom's name is Maude Ford.

A: My mom could never tell you that. I spent five years in the military law and with law enforcement.

Q: Your mom's name is Maude Ford:

A: Correct.

Q: Lives in Pompano Beach, Florida?

A: My mother does not live in Pompano Beach, Florida. My mother lives in Hollywood, Florida.

Q: Hollywood, Florida? Would it surprise you that she said you left because you were accused of a crime in Kingston, Jamaica?

A: My mom could never tell you that I was accused of a crime in Kingston, Jamaica, Mr. McCune.

Q: Would it surprise you that I talked to your mom on the phone?

A: Well, Mr. McCune, you could not have talked to my mom on the phone. My mom does not have a phone. You might have got that communication because I communicated with my mom from the mail while I'm here.

Q: Would it surprise you that I looked up your mom's name on the internet, and your mom has a phone?

A: My mom does not have a phone, Mr. McCune. I would have called her from — if my mom had a phone, I would have called her. And I know that the phone record doesn't show that I ever called my mom since I'm here, and that is my mom.

Q: Right. And, so, it doesn't surprise you that your mom said you were accused of a crime in Kingston, Jamaica, and that's why you came to America?

A: I never . . . was accused of a crime in Jamaica. I spent five years in the military, and I happened to be . . . [to] help the DEA from here to put away people like politicians who are involved in drugs and — er — er — gang leaders.

Q: Mr. McKenzie, would it surprise you that DEA said they had no record of your ever helping, assisting, or arresting anybody?

A: That could never be true, Mr. McCune, because DEA came to Jamaica back then in order for us to stop the flow of drugs coming from Jamaica to this country.

Q: Mr. McKenzie, my question is, would it surprise you that they have no record of you ever helping or assisting?

A: It would surprise me, because I helped.

Q: Okay. Thank you.

The next exchange occurred when McCune was asking McKenzie about McKenzie's response to the temperature variance in the back of the truck[2]:

Q: Wouldn't you think the fruit companies have a better knowledge of how to refrigerate fruit than you?

A: I have seen where shippers tell you to put your —

Q: Mr. McKenzie, my question is, don't you think they would have a better knowledge than you, not other shippers, you?

A: I have better knowledge. I see where I have knowledge better than the shippers because they tell you to put — to set the temperature at a certain degree, and it is wrong.

Q: Now, when you're loading, are you permitted to be back there and watch them load?

A: Most docks, you are not in California.

Q: I'm not talking about most docks. These loads you picked up.

A: I never did.

Q: Are you permitted?

---

[2] Despite this exchange, the State never introduced testimony or documentary evidence from either of the two California shipping companies that would have proven what their shipping practices were.

A: You are not permitted.

Q: Not permitted?

A: Because of liability purpose. I was there.

Q: Would you be surprised if Blue Banner says they have posted signs, saying, stand back there and watch it and count it?

A: They never — there was no sign that says, driver — I see sign for liability purpose; the drivers are not permitted on the dock. You could get sued — they could get sued for it.

Q: Would it surprise you that Blue Banner said they had posted signs, saying to watch it?

A: It would surprise me.

Q: Would it surprise you that Ventura Pacific says that more than ninety percent of the drivers stand back in the loading docks and watch it and watch it be counted?

A: There was no reason — when I went there, that was the reason why the loading had —

Q: Mr. McKenzie, my question is, would it surprise you that Ventura Pacific says that more than ninety percent of their drivers watch it being loaded and counted?

A: It would surprise me, Mr. McCune, because there were signs there, that says that there is no — drivers not permitted to be on the dock because of liability purpose.

Q: So, it would surprise you that if Ventura said the drivers are encouraged to observe the product as it is loaded, as they are solely responsible for their count and the method of loading?

A: It would surprise me because they didn't want you to be on the dock, in the first place; and then it was a contract between the shipper and receiver. There was no reason for me to be on the back[.]

Q: So Blue Banner and Ventura Pacific, they'd be lying if they said that you could stand back there and watch?

A: It's a surprise to me because the sign is there.

Q: Would it also surprise you that Ventura Pacific, in checking this load number, says, no locks or seals were applied to your trailer?

A: There's a contract between the shipper and the receiver. There was —

Q: My question is, would it surprise you when they check their loading records, that no lock or seal was applied to your trailer?

A: It would surprise me because they gave me a lock to put on that trailer because of the contract between the shipper.

Q: Would it surprise you that Blue Banner does not lock or seal?

A: It surprises me because they do have a lock and seal.

Q: Would it surprise you that Ventura says, we do not use door locks under any circumstances?

A: It surprises me because they gave me a lock; they had a lock there.

\* \* \* \*

Q: So, it would surprise you when they say — these companies say, we don't put locks or seals under any circumstances?

A: It would surprise me.

Q: Who opens up your doors?

A: When we back up there, somebody's there with a key because once you give them your load number and your shipping number —

Q: Who opens up your doors? The question is, who opens up your doors?

A: They got a hand, somebody there, that comes out there with the key to open the door.

Q: Would it surprise you that Blue Banner and Ventura says [*sic*] that the driver backs it up, the driver opens the door, the driver pulls forward, and the driver closes the door?

A: It surprises me, Mr. McCune, because on this particular load, this is exactly what took place.

Q: So these companies, again, would be lying?

A: [No oral response.]

Finally, we quote prosecutor McCune's statements made during his closing argument:

> What did McKenzie put on the truck, a lock that he had the key to. Jack Stepp testified that in his fifteen years of experience, produce haulers driving trucks do not lock their trucks. *Blue Banner and Pacific, they don't put any locks or seals on it because it's fruit.* It's not like they're hauling TVs, it's not like they're hauling DVD players for Best Buy or something like that. *It's true. They don't lock them. Blue Banner doesn't lock; Ventura Pacific doesn't lock.*

> \* \* \* \*

> Then we use our common sense on who's responsible for the load. All the officers testified, even — even McKenzie said that the driver's responsible for it. *Ventura Pacific said over ninety percent of their drivers watch it because they're responsible.... Blue Banner says the drivers, they have signs posted up there saying, you need to watch it and you need to count because you're responsible.*

(Emphasis added.) And during his rebuttal closing argument, McCune said the following:

> [McKenzie] said that truck drivers, this is all standard procedure, they don't watch it, they don't pay attention. Well, *what did Ventura Pacific say, that ninety percent of the drivers watch the loading procedure, watch it and count it.* Mr. McKenzie got up there and said, oh, the

> *companies open and close your doors; [but] both Blue Banner and Ventura Pacific said no, it's the driver's truck, they open it and they close their doors.* Mr. McKenzie said they lock it, and there's a contract, where they've got this key that they just pass it on to these different companies. *Well, Ventura Pacific on this particular load number said no locks or seals applied. Blue Banner says no locks applied.*

(Emphasis added.)

Clearly, Mr. McCune was, in essence, testifying during his cross-examination of McKenzie; just as clearly, because the State never called a witness from either Blue Banner or Ventura Pacific to testify about the companies' shipping practices during the State's case-in-chief, McCune was arguing facts not in evidence during his closing arguments. The question, however, is whether this unprofessional conduct was so egregious as to give rise to the trial court's duty to intervene, without an objection from McKenzie's attorney, Charles Waldman.

In *Wicks*, 270 Ark. 781, 606 S.W.2d 366, this court recognized four exceptions to the contemporaneous objection rule, of which only the third one is relevant in the instant case. The *Wicks* court wrote as follows:

> A third exception is a mere possibility, for it has not yet occurred in any case. That relates to the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial. We implied in *Wilson v. State*, 126 Ark. 354, 190 S.W. 441 (1916), that no objection is necessary if the trial court fails to control a prosecutor's closing argument and allows him to go too far: "Appellant can not predicate error upon the failure of the court to make a ruling that he did not at the time ask the court to make, unless the remarks were so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury not to consider the same. *See Kansas City So. Ry. Co. v. Murphy*, 74 Ark. 256 [85 S.W. 428 (1905)]; *Harding v. State*, 94 Ark. 65 [126 S.W. 90 (1910)]."

*Wicks*, 270 Ark. at 786.[3] Of particular importance for the present case, however, the *Wicks* court also rendered the following caution:

---

[3] The first exceptions occur 1) when the trial court fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself; 2) when defense counsel has

It must be noted that, first, we did not reverse the judgment in *Wilson*, and second, the quoted statement was taken essentially from the cited *Murphy* case, where we went on to say explicitly that *if the court fails to restrain an improper argument, counsel should make a definite objection and call for a ruling.* We have mentioned the *Wilson* suggestion in two recent cases, but in neither one was the judgment actually reversed because of the trial court's failure to act on its own motion. *Ply v. State,* 270 Ark. 554, 606 S.W.2d 556 (1980); *Wilson & Dancy v. State,* 261 Ark. 820, 552 S.W.2d 223 (1977). Thus, every statement of the original *Wilson* suggestion has been *obiter dictum,* because *no judgment has been reversed on account of the trial court's failure to intervene.* Such a reversal would necessarily be an extremely rare exception to our basic rule.

*Id.* at 786-87 (emphasis added); *see also Vaughn v. State,* 338 Ark. 220, 992 S.W.2d 785 (1999) (refusing to apply third *Wicks* exception in the case of allegedly improper cross-examination).

 McKenzie concedes that this exception has still never been applied in the context of improper cross-examination or closing arguments. Indeed, this court recently pointed out in *Anderson v. State,* 353 Ark. 384, 108 S.W.3d 592 (2003), that the third *Wicks* exception has only been applied to cases in which a defendant's fundamental right to a trial by jury is at issue. *Anderson,* 353 Ark. at 398 (citing *Grinning v. City of Pine Bluff,* 322 Ark. 45, 907 S.W.2d 690 (1995); *Calnan v. State,* 310 Ark. 744, 841 S.W.2d 593 (1992); and *Winkle v. State,* 310 Ark. 713, 841 S.W.2d 589 (1992)). The *Anderson* court further pointed out that the third *Wicks* exception "has not been applied to consider possible prosecutorial errors in relation to cross examination, *Vaughn v. State,* [*supra*], to privileged testimony, *Hale v. State,* 343 Ark. 62, 31 S.W.3d 850 (2000), or closing arguments, *Buckley* [*v. State,* 349 Ark. 53, 76 S.W.3d 825 (2002)], and *Greene v. State,* 343 Ark. 526, 37 S.W.3d 579 (2001)." *Id.*

 In *Buckley, supra,* this court rejected an argument that the prosecutor's reference to another criminal case was improper

---

no knowledge of the error and hence no opportunity to object. The fourth exception arises in the context of Ark. R. Evid. 103(d), which provides that the appellate court is not precluded from taking notice of errors affecting substantial rights, although they were not brought to the attention of the trial court. *See Wicks,* 270 Ark. at 785-87; *Anderson v. State,* 353 Ark. 384, 108 S.W.3d 592 (2003).

and fundamental error; there, the State had asked a character witness for the defense if she " 'would be surprised' to find out that Buckley had provided drugs to 'some person who was on a binge that killed somebody that night.' " *Buckley*, 349 Ark. at 69. Despite Buckley's protestations of prejudice, this court held that "this kind of alleged error *must be preserved by contemporaneous objection.*" *Id.* at 70 (emphasis added). In addition, the *Buckley* court rejected an argument that the third *Wicks* exception should apply where the State had allegedly argued outside the record by telling jurors that Buckley had been trafficking in drugs for ten years. Buckley did not object that the prosecutor was arguing outside of the record, and this court declined to conclude that this kind of error was so "fundamental" that the *Wicks* exception should apply. *Id.* at 69.

In the instant case, while we express serious concern over both prosecutor McCune's improper cross-examination and closing argument and defense attorney Waldman's obvious failure to object to the prosecutor's overly aggressive conduct, we must conclude that the errors of which McKenzie complains are not of the sort that fall into the third *Wicks* exception and that would require the trial court to intervene on its own motion. McKenzie's remedy, if any, is a petition for postconviction relief under Ark. R. Crim. P. 37.

Affirmed.