2009 Ark. App. 597

Luis CAMACHO–MENDOZA, Conrado Giovany Cordona–Duarte, Angel Yonis Romero, Appellants,

v.

STATE of Arkansas, Appellee.

No. CA CR 08–1251.

Court of Appeals of Arkansas.

Sept. 16, 2009.

James Law Firm, by: William O. "Bill" James, Jr., Little Rock, for appellants.

Dustin McDaniel, Att'y Gen., by: Karen Virginia Wallace, Ass't Att'y Gen., for appellee.

KAREN R. BAKER, Judge.

A jury in Crawford County Circuit Court convicted appellants Luis Camacho–Mendoza, Conrado Giovany Cordona–Duarte, and Angel Yonis Romero of possession of cocaine with intent to deliver and possession of drug paraphernalia. Each appellant received a sentence of 480 months for possession with intent to deliver and a sentence of 120 months for possession of drug paraphernalia. The sentences were to run consecutively. On appeal, appellants assert first that the trial court committed error when it denied their motion for a directed verdict based on a lack of probable cause for the initial traffic stop made by Trooper Waters, and second, that appellants did not waive their *Miranda* rights voluntarily, knowingly, and intelligently. Because appellants' arguments were not preserved for our review, we affirm appellants' convictions.

On January 23, 2008, appellants Luis Camacho–Mendoza, Conrado Giovany Cordona–Duarte, and Angel Yonis Romero were traveling along Interstate 40 near Van Buren in a blue Chevrolet Cobalt. State Trooper Chris Waters was parked at mile-marker ten along Interstate 40 and was watching traffic in the eastbound lane.

He testified that when appellants' vehicle passed him in the eastbound lane, he observed several air fresheners hanging from the vehicle's rear view mirror. Trooper Waters followed the vehicle. He noticed a North Carolina Rent–A–Car bumper sticker as well as a bar-code sticker on the rear bumper. He testified that he was going to "run the tag" on the vehicle. He acknowledged that at this point the driver, Camacho–Mendoza, "had done nothing illegal." The report came back indicating that the North Carolina tags on the vehicle were not registered to a Chevrolet Cobalt but to a Chrysler Sebring.

Based on the fictitious tags, Trooper Waters suspected that the vehicle could be stolen. He, therefore, initiated a stop. Trooper Waters approached the vehicle on the passenger side and asked Camacho–Mendoza to accompany him to his patrol car. Trooper Waters said Camacho–Mendoza appeared very nervous, had "trembling" hands, and would not make eye contact with him. Camacho–Mendoza told him that Romero had rented the vehicle, and Camacho–Mendoza identified Romero as the passenger sitting in the front seat of the vehicle. Trooper Waters then approached the passenger side of the vehicle to obtain the rental agreement. As he did so, he observed Romero putting something in the front of his pants. Trooper Waters testified that he believed that Romero was reaching for a gun, and based on that belief, Trooper Waters pinned Romero's chest to the seat of the vehicle. Trooper Waters pulled Romero's shirt back and saw a duct-taped package. Realizing it was not a gun but rather possible contraband, he pulled Romero from the vehicle. Simultaneously, Trooper Waters instructed Camacho–Mendoza to put his hands on the patrol car. At this point, another officer arrived to assist Trooper Waters. Romero was handcuffed, and the package was pulled from his pants. Another duct-taped package was found under the seat, along with $2450 in cash.

Trooper Waters testified that during his encounter with the suspects, he did not have any difficulty communicating with any of them, despite their Hispanic backgrounds. Waters testified specifically that Camacho–Mendoza "seemed to understand the reason [he] stopped him." Trooper Schmidt explained that he Mirandized the appellants once they were transferred to the Fort Smith State Police Headquarters. Trooper Schmidt testified that he read aloud the rights form in English while appellants followed in Spanish. Camacho–Mendoza signed the Spanish form and wrote "yes" on each of the five lines. Camacho–Mendoza indicated to Schmidt that he understood his rights. Trooper Schmidt stated that "when [he] talked to them in English they gave [him] appropriate responses in English." Schmidt stated that it did not appear that the appellants had any problem answering the officers' questions. Trooper Schmidt asked Camacho–Mendoza if he needed an interpreter, and Camacho–Mendoza responded that he could understand the troopers' questions without an interpreter. Appellants signed the *Miranda* forms and gave tape-recorded statements.

Camacho–Mendoza testified on his own behalf. He stated that he was a resident of Mexico and that he had been in the United States for two years. He stated that he currently lived with his wife and child in Winston–Salem, North Carolina. While living in North Carolina, he was employed at a Burger King restaurant and Cracker Barrel where he was responsible for cleaning the establishments and washing the dishes. Camacho–Mendoza described the events that led up to his arrest. He stated that in January 2008, Cordona–Duarte and Romero invited him to a party in Texas. Camacho–Mendoza explained

that before leaving for Texas, a person known as "The Dog" sent them money to rent a car in Charlotte, North Carolina. Romero rented the vehicle in his name. Camacho–Mendoza testified that he was leaving his current job in hopes of finding construction work in Texas. When they arrived in Texas they met The Dog, and he instructed them to go to Los Angeles. Appellants were in Los Angeles for only one day; while they were there, "the package was passed to [them] at a gas station." Camacho–Mendoza testified that he suspected that the package contained drugs, although he did not know what type of drugs. He also suspected that it was The Dog that made the drug deal and that The Dog was using them "to make the delivery."

Camacho–Mendoza testified that they left Los Angeles and intended to drive straight back to North Carolina. Although Camacho–Mendoza did not have a valid United States drivers' license, he alternated with the others in driving the rental car. He had just begun to drive when they were pulled over while driving on Interstate 40 in Arkansas on their way back to North Carolina. Camacho–Mendoza testified that he was nervous when Trooper Waters pulled him over because he knew that he was illegally in the United States and feared that he would be deported. Camacho–Mendoza stated that he exited the vehicle. Trooper Waters began asking him questions, and Camacho–Mendoza testified that he "didn't understand" Trooper Waters's questions. He explained that the packages of drugs were "on the floor" of the vehicle and were "visible." Appellants were taken into custody, and Camacho–Mendoza stated that he remembered Trooper Schmidt handing him a written form in Spanish. He admitted that he signed the form, but stated that he could "read a little bit." He only attended school for "about two years." He stated

that even after being transferred to Fort Smith, he still "didn't understand all of the questions at the time." He testified that he was afraid of the drug dealers involved in the transaction, and based on that fear, he gave the police the contact information that he had for the dealers.

Cordona–Duarte testified that he could "read and write in Spanish a little" and that he could "not read and write in English." He testified that he had only three years of schooling. He had been in the United States for nine years and had worked at Cracker Barrel for six years. He testified that The Dog was going to get him construction work in Amarillo, Texas. When they arrived in Amarillo, they met The Dog. He explained that they stayed in Amarillo for a couple of days before leaving for Los Angeles with "two things that were wrapped up." He stated that he did not know what was in the packages. He suspected that the packages contained drugs, but "it was [too] late." He felt that he was "tricked." The Dog made all of the arrangements. Cordona–Duarte testified that he had already been paid for delivering the packages. He explained that once the men were at the Fort Smith police headquarters, his request for an interpreter was denied. He stated that Trooper Schmidt read him a rights form that was in English, and he was handed a Spanish form that he could only read "a little." He testified, however, that he signed the form.

Romero testified that he had been living in the United States for ten years and had been working with a permit as well as a Social Security number. He testified that he had an eighth grade education and could read and write in Spanish. He stated that he met Cordona–Duarte and Camacho–Mendoza at a party in North Carolina. In January 2008, the three of them decided to go to Texas. He was told that there was work in Amarillo and that The

Dog, whom he had never met, would transfer money to him ($3000) in North Carolina. He stated that he rented the vehicle in Charlotte, North Carolina. Three days later they left for Amarillo, where they stayed for two days. They met up with The Dog, and he told the men to go to Los Angeles where he had friends with work for the men to do. He testified that he realized that the work was not construction work when The Dog told the men to go straight back to North Carolina from Los Angeles. He testified that he had not used or seen drugs before, so he did not understand the situation. He stated that Camacho–Mendoza had two cellular phones on his person and that Camacho–Mendoza was the one that was in contact "with The Dog or the people [they] were supposed to meet" during the trip. He testified that in Los Angeles, two packages were loaded into the rental car and the men were instructed to return to Charlotte. He described the two packages as appearing to "contain white stuff" and being wrapped "in plastic and duct tape." He testified that the men were supposed to be getting $500 for the delivery.

Romero also gave his version of the events during and after the traffic stop. He explained that he was sitting in the front seat of the rental car when Trooper Waters pulled them over. He stated that he was asleep when Trooper Waters approached the passenger side of the vehicle and that Trooper Waters woke him and asked him for his driver's license. Romero explained that when he leaned forward to get the rental agreement from the glove box, Trooper Waters saw the package lying on the floor. Trooper Waters asked Romero to hand him the package, and in the process, "it ended up in [his] lap." The Trooper then placed his hand on Romero's shoulder and asked him to get out of the car and handcuffed him. Romero specifically denied putting the package down his pants.

Romero stated that at the police station he gave Trooper Schmidt permission to record the conversation. Trooper Schmidt asked him questions in English, and Romero stated that sometimes he understood the question and sometimes he had to ask Schmidt to repeat the question. Schmidt had Romero read the rights form in Spanish. Romero admitted to signing the form. He stated, however, that his request for an interpreter was denied. He testified that he spoke "little English" and understood "some wor[d]s." He admitted that he was speaking English on the video tape, but that he did not "speak perfect English."

The crime lab report showed that the white powdery substance taken from appellants' vehicle was cocaine and that the two packages together weighed 1,987.3 grams. Following the investigation, appellants were charged with one count of possession of cocaine with intent to deliver and one count of possession of drug paraphernalia. After a jury trial, appellants were convicted on both counts and sentenced to 600 months' imprisonment in the Arkansas Department of Correction. This appeal followed.

For their first point of error, appellants allege that the trial court committed error when it denied their motion for a directed verdict. As part of their directed-verdict motion, appellants argued below that without the physical evidence and the statements from appellants, there was insufficient evidence to support their convictions. They moved to dismiss the charges on the basis that Trooper Waters lacked probable cause to stop the vehicle. For their second point of error, appellants assert that their *Miranda* rights were not waived voluntarily, knowingly, and intelligently because their rights were not adequately

communicated in either Spanish or English, preventing appellants from understanding the nature of their rights or the consequences of waiving them. For these reasons, appellants assert that all physical evidence seized and statements made should have been suppressed.

The issue of suppression of the physical evidence and statements was presented to the court for the first time at the close of the State's evidence. Appellants did not file a motion to suppress prior to trial nor did they object to the introduction of either the evidence or statements when they were presented to the jury. A similar argument was presented to this court in *Holt v. State*, 15 Ark.App. 269, 692 S.W.2d 265 (1985). In *Holt,* this court held

> We decline to reach the merits of the issue raised by the appellant because the issue was not properly presented to the trial court. Although the appellant, on appeal, labels his motion a "motion to dismiss," in reality it was a motion to suppress the evidence coupled with a motion for a directed verdict. Motions to suppress are governed by Rule 16.2 of the Arkansas Rules of Criminal Procedure. Rule 16.2(b) requires that such a motion be timely filed, but not later than 10 days before trial, except that the trial court has discretion to allow a later motion to suppress on a showing of good cause. No motion to suppress was filed prior to trial, and no attempt was made to demonstrate good cause for waiting until the close of all evidence to attempt to exclude a portion of the evidence which was presented to the jury without objection. We hold that the attempt to suppress the evidence was not timely, and need not have been considered by the trial judge. *Jackson v. State*, 266 Ark. 754, 585 S.W.2d 367 (Ark.App. 1979), cert. denied, 444 U.S. 1017, 100

S.Ct. 670, 62 L.Ed.2d 647 (1980). Further, since there was no objection to any of the evidence or testimony at the time it was presented to the jury, there was no basis for striking that evidence later.

*Id.* at 270–71, 692 S.W.2d at 267.

 As in *Holt,* appellants made no motion to suppress the evidence and statements, nor did they object to the evidence or testimony as it was submitted to the jury. A contemporaneous objection is required to preserve an issue for appeal. *Dulaney v. State*, 327 Ark. 30, 937 S.W.2d 162 (1997); *see also Fields v. State*, 349 Ark. 122, 76 S.W.3d 868 (2002) (stating that a contemporaneous objection is required to preserve an issue for appeal). Because appellants failed to move to suppress the evidence or to make a contemporaneous objection, their arguments are not preserved for our review. Nor do we find this to be the type of alleged error exempt from our requirement of a contemporaneous objection under *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

 Furthermore, were appellants' arguments regarding sufficiency of the evidence preserved, they are unavailing. In determining the sufficiency of evidence, we review all of the evidence that was introduced at trial, and we disregard any alleged trial errors. *Dodson v. State*, 341 Ark. 41, 14 S.W.3d 489 (2000) (citing *Eichelberger v. State*, 323 Ark. 551, 916 S.W.2d 109 (1996), which states that an appellate court reviews *all of the evidence* introduced at trial, *whether correctly or erroneously admitted* ) (emphasis added).

The evidence introduced at trial showed that Trooper Waters initiated a traffic stop of appellants' rental vehicle after he determined that the tags were not registered to that vehicle. Trooper Waters discovered a

duct-taped package on Romero, a duct-taped package under the seat, and more than $2400 in cash. Each package contained a kilo of cocaine. Appellants each signed a rights form indicating that they understood their rights and then gave incriminating statements. Therefore, there was sufficient evidence that supports appellants' convictions for possession of cocaine with intent to deliver and possession of drug paraphernalia.

Affirmed.

ROBBINS and MARSHALL, JJ., agree.