2010 Ark. App. 767

**Phillip W. HOLLOWAY, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–81.**

Court of Appeals of Arkansas.

Nov. 17, 2010.

Eddie N. Christian, Christian & Byars, Matthew Horan, Smith, Cohen, Horan, PLC, Fort Smith, for appellant.

Dustin McDaniel, Atty. Gen., Kathryn Henry, Asst. Atty. Gen., Little Rock, for appellee.

LARRY D. VAUGHT, Chief Judge.

By felony information appellant Phillip Holloway was charged with the first-degree murder of his wife, Erma Holloway. He was convicted of the lesser-included offense of second-degree murder. On appeal he argues (1) that there was insufficient evidence to prove that a homicide occurred; (2) that the evidence was insuffi-

cient to prove that he had the requisite intent for second-degree murder; (3) that the trial court erred in its failure to address police and prosecutorial misconduct; (4) that the trial court erred by instructing the jury on the lesser-included offense of second-degree murder; (5) that the trial court erroneously denied his mistrial motion; and (6) that the trial court erroneously allowed one of the State's witnesses to give expert testimony. After a careful review of each point on appeal, we affirm appellant's conviction.

We first turn our attention to appellant's sufficiency arguments. In Arkansas, a person commits second-degree murder in either of two ways: (1) when the person "[k]nowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life," or (2) "[w]ith the purpose of causing serious physical injury to another person, . . . [he] causes the death of any person." Ark.Code Ann. § 5–10–103(a) (Repl.2006). A person acts knowingly with respect to his conduct or the attendant circumstances when he "is aware that his . . . conduct is of that nature or that the attendant circumstances exist," and he acts knowingly with respect to the result of his conduct when "he . . . is aware that it is practically certain that his . . . conduct will cause the result." Ark.Code Ann. § 5–2–202(2)(A) & (B) (Repl.2006). Further, "extreme indifference" has been defined by our court as deliberate conduct that culminates in the death of another person. *Mainard v. State*, 102 Ark.App. 210, 214, 283 S.W.3d 627, 630 (2008).

Appellant claims that insufficient circumstantial evidence was presented to establish (1) that his wife's death resulted from murder as opposed to an automobile accident, and (2) alternatively, if she was murdered, the State failed to prove that he possessed the requisite mental state to support the conviction. However, at trial,

appellant's directed-verdict motion focused solely on the circumstantial nature of the evidence. He argued that the State's case did not exclude every other reasonable hypothesis consistent with innocence—specifically, he claimed that the State failed to prove that a murder (as opposed to an automobile accident) occurred. As we have stated numerous times, sufficiency-of-the-evidence challenges must be specific enough to advise the trial court of the exact element that the State has failed to prove. *Pratt v. State*, 359 Ark. 16, 23, 194 S.W.3d 183, 188 (2004). Further, parties are bound by the scope and nature of the objections and arguments presented at trial. *Rounsaville v. State*, 372 Ark. 252, 256, 273 S.W.3d 486, 490 (2008). As such, because appellant did not raise his intent argument below, on appeal we will consider only the circumstantial-evidence portion of his sufficiency challenge.

When we review a trial court's denial of a directed-verdict motion that is based on a lack of sufficient evidence, we must affirm the denial if there is substantial evidence—direct or circumstantial—to support the conviction. *McKenzie v. State*, 362 Ark. 257, 262, 208 S.W.3d 173, 175 (2005). Substantial evidence is evidence forceful enough to compel a conclusion beyond reasonable suspicion or conjecture. *Id.*, 208 S.W.3d at 175. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.*, 208 S.W.3d at 175. Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Coggin v. State*, 356 Ark. 424, 431, 156 S.W.3d 712, 717 (2004). Overwhelming evidence of guilt is not required in cases based on circumstantial

evidence; rather, "the test is one of substantiality." *Id.* at 432, 156 S.W.3d at 717.

▮ Further, the question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. *Ross v. State,* 346 Ark. 225, 230, 57 S.W.3d 152, 156 (2001). The trier of fact "may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's"; we will not second guess these determinations. *Barrett v. State,* 354 Ark. 187, 195, 119 S.W.3d 485, 490 (2003). Furthermore, inconsistent testimony does not render proof insufficient as a matter of law. *Harmon v. State,* 340 Ark. 18, 24–25, 8 S.W.3d 472, 476 (2000).

▮ On appeal, appellant contends that the evidence is insufficient to prove that a homicide occurred and instead supports his theory of the case—that Erma drowned *after* exiting her wrecked, water-submerged automobile. The evidence at trial established that at 9:34 a.m., Sergeant Josh Mourton and Chief Deputy Sheriff Terry Staggs responded to a 911 call made by Jim Smittle who reported that he and appellant had found Erma's body in a pond located on appellant's farm. When Mourton and Staggs arrived at the scene, appellant was sitting at the edge of the pond, holding his wife's body in his arms. Shortly thereafter, another officer, Sheriff Cody Carpenter, arrived at the scene. He asked appellant to move away from the pond while Mourton removed the body from the water. The officers immediately noticed that Erma had abrasions to her head, nose, lip area, right elbow, and legs, and had dried blood underneath her nose and above her lip.

When questioned about the events leading up to his wife's demise, appellant told the officers that the evening before, around 9:00 p.m., he and Erma had gotten into an argument about their relationship. He explained that because they had been drinking, he "could not let her go." Appellant then told officers that despite his efforts, Erma eventually left via automobile. The officers inquired about where her car was located if she had left the scene. Appellant answered that he thought the car was inside the pond because he had observed—as Erma exited down his gravel drive—the tail lights on her automobile cease to glow when she neared the pond area. Appellant volunteered that he believed Erma's car was in the pond when it stopped.

Following this revelation, Heath Tate and Brian Keys, members of the Yell County Dive Team, conducted a search of the pond in an attempt to recover Erma's vehicle. Tate and Keys began their search by walking along the path of tracks they believed to be left by an automobile heading into the pond. After finding nothing, they began a grid-style search of the pond. Eventually they located the car, just to the right of the underwater tire tracks. The water provided zero visibility; in fact Keys touched the vehicle before he saw it. Both divers testified that neither the windows nor the doors on the car were open. Keys explained that at one point he mistook an open fender well for an open door, but after orienting himself with the correct position of the car, he realized his mistake. The divers then hooked a cable to the rear of the vehicle and towed the car out of the water. Deputy Staggs testified that all of the windows and doors were closed when the vehicle emerged from the water. He also noted that the gear shift on the vehicle was in neutral.

Later that afternoon, officers obtained a search warrant for appellant's residence. Sheriff Carpenter recalled a strong odor of bleach when he first entered the residence. Also, during the search, Investigator Todd

Garzon located a small, dark-red droplet (that appeared to be blood) under a recliner in the living room. There was also a red substance visible on the rug that was placed in front of the recliner. The officers also found rags in and around the washing machine. The rags were heavily bleached, yet had rust colored stains that appeared to Sheriff Carpenter to be blood. Ryan Kent, a forensic serologist with the Arkansas State Crime Laboratory, confirmed a blood recovery from three locations—blue coveralls found in appellant's bedroom, and the recliner and the rug located in the living room. The blood from the coveralls was identified as appellant's; the blood from the floor and rug belonged to Erma.

Appellant voluntarily accompanied officers to the Scott County Sheriff's Office to answer questions about Erma's death. After waiving his *Miranda* rights, appellant explained that he and Erma had been married for forty years and had two children. She lived in town; he lived on the farm. Despite being separated, she occasionally came out to the farm, made him dinner, and spent the night. Appellant admitted that he had a girlfriend who he had been dating for about five years, but that he and Erma still loved each other and had discussed reconciliation. He noted that Erma had reservations about reuniting with him because of his girlfriend, and he had reservations about rekindling his relationship with Erma because she was addicted to pain pills.

Appellant explained to officers that on the evening in question, after drinking several pitchers of gin and lemon-flavored Kool–Aid, he and Erma began to argue, and she indicated that she was going to leave. He took her car keys and told her she should not leave because she was intoxicated. He admitted that as she tried to leave, he grabbed her and slung her back into the recliner, which tipped over on impact. He also acknowledged kicking her on the hips and in the side. Appellant explained that as this altercation was unfolding, the telephone in his residence rang. It was a neighbor asking for permission to go fishing in appellant's pond, which was granted.

However, according to appellant, while he was conducting this conversation, Erma found a second set of keys and departed from his residence. Appellant stated that he heard her car start, saw gravel flying, and then saw the car's rear lights in a stationary location. He got in his "Gator" all-terrain vehicle to look for her; appellant said he found nothing and returned to the residence. He claimed to have called Erma's home several times that evening, but received no answer.

During the interview, appellant acknowledged that in 2005 he was convicted of domestic battery against Erma and served one year in jail for his crime (the judgment from his 2005 domestic-battery conviction was admitted into evidence). He described the circumstances of the 2005 battery as a repeated hitting of Erma and then he "went and got a belt and [he] just beat her all over . . . ."

In addition to the officer's testimony, the State presented evidence from Robert Ivy (a certified automotive technician). Ivy testified that there was a ninety-five percent chance that the engine was not running when it entered the water. He also noted that although there were three small fish found inside of the vehicle, that did not prove that any of the windows or doors of the vehicle were opened at any time while the car was submerged. He explained that the small fish could have entered through the air-conditioning vents of the vehicle.

Dr. Frank Peretti, the medical examiner who performed an autopsy on Erma, testified that she had a broken nose, two black

eyes, broken ribs, injuries to her neck, and bruising over her entire body. He concluded that "there was a violent struggle" and identified the struggle as "physical combat." He explained that her extremity injuries were defensive in nature and unequivocally ruled Erma's death a homicide. He testified that in his medical opinion the cause of death was blunt-force trauma. He also noted that during the altercation, Erma could have suffered a heart arrhythmia, but that he would still classify the manner of death as blunt-force trauma because of the violent struggle that Erma endured. Dr. Peretti also concluded that Erma did not drown because she was already deceased before her body entered the water.

In fact, Peretti was initially informed that one of the car doors was open (he later learned all of the doors and windows were shut), and still concluded that given her age, physical condition, and blood-alcohol content of .08, if Erma had been in the vehicle when it entered the water, she would have encountered extreme difficulty if not impossibility exiting the vehicle alive. Also, he opined that divers would have found the door of the car in an open position because she would not have been able to shut it. He also noted that had she been able to get out of the vehicle, she would have exhibited the "classic findings of a drowning, the heavy lungs, the froth, the edema, which she doesn't have." He ultimately stated there was no evidence of drowning.

On cross-examination, Dr. Peretti was asked about a phenomenon known as "dry drowning," which was a theory advanced by appellant at trial. Dr. Peretti stated that in his medical opinion (and based on the medical literature) the concept is just a hypothesis. In fact, Dr. Joseph Lawton Burton, appellant's expert witness (who testified that ten to fifteen percent of people who drown do not have water in their lungs), acknowledged on cross-examination that the book he relied on to support his dry-drowning explanation contained a disclaimer that stated "[w]hile the aforementioned explanation of dry drowning is interesting it is hypothesis and not proven. Thus, the authors do not endorse use of this term or concept."

The State also called Don Johnston, an accident-reconstruction expert. He testified that in his opinion the engine on Erma's car was not engaged when it entered the water. He also noted that until the car had fully filled with water it would have been difficult to open any of the vehicle's doors. He testified that once the car was fully submerged the pressure would have equalized on both sides and at that time a door could be opened. According to Johnston, Erma's car sustained body damage consistent with it being pushed into the water by appellant's "Gator." He noted that this type of pushing was consistent with the body damage the car sustained—in terms of "Gator" speed, force, and height of pressure. He offered the following observations and opinions as to the causes of the body damage Erma's car sustained:

> The windows were up on the car. The car was in neutral. The key was on. I firmly believe that the vehicle was first approached from the back in an effort to push it into the pond. When the key is on you can steer the vehicle.... Trying to push the car from the back, you cannot control the direction it is going. I think the car was turned around and pushed from the front backwards, so that you can control it, because as you turn the pushing vehicle you can turn the car just like pushing a trailer. When the car hit the water, the pond was soft, and there was a big bump, and that is what banged the car in. Because of when it ran off into the water and hit the mud, the resistance greatly stopped

and say the car was going 10–miles an hour, then you are coming to a pretty smooth halt as far as not very far. So, there is a big jar there, and I think that is what damaged the front of the car.

Considering (in the light favorable to the verdict) the abundance of circumstantial evidence presented by the State at trial, we are satisfied that sufficient evidence supports appellant's second-degree-murder conviction. *McKenzie*, 362 Ark. at 262, 208 S.W.3d at 175. Ultimately, the resolution of the question on appeal rests on the credibility (or lack thereof) of appellant, the reconstruction experts, the medical examiner, and the officers and divers. And, this determination is strictly within the province of the jury. *Moore v. State*, 315 Ark. 131, 134, 864 S.W.2d 863, 864 (1993). The jury did not find appellant's version of events to be credible, and we yield to the jury's finding of guilt and affirm on this point.

■ Next, appellant contends that he suffered police and prosecutorial misconduct before and during the trial so severe and cumulative that he was denied due process of law. However, in order for us to consider a cumulative-error argument on appeal, appellant was required to show that he objected to each error individually and offered a final, all-encompassing cumulative-error objection. *See Robinson v. State*, 348 Ark. 280, 299, 72 S.W.3d 827, 839 (2002). Here, appellant has failed to show that he contemporaneously objected to the introduction of the allegedly fabricated evidence (on which his claim is based) or alternatively asked for an admonishment or mistrial. As such, he has failed to preserve his cumulative-error argument for appeal. *Id.*, 72 S.W.3d at 839.

■ Appellant also claims that because he maintained his outright innocence throughout trial, there was no rational basis for instructing the jury on the lesser-included offense of second-degree murder.

It is appellant's position that the jury should have had the singular task of simply determining whether he was either guilty or innocent of first-degree murder. The following colloquy occurred at trial, before the jury instructions were read:

APPELLANT'S ATTORNEY: Your honor, I'm duty bound to do this. My client does not want the jury instructed on the three lesser included offenses.

DEPUTY PROSECUTOR: And of course, I am requesting the lesser included offenses. I think there is a reasonable basis for those, and therefore it would not [be] error to give them.

THE COURT: Any argument on that, Mr. Christian?

APPELLANT'S ATTORNEY: I read the law; I know what it is.

DEPUTY PROSECUTOR: I suspect it is what I said it was.

THE COURT: So, we are concluded for tonight. See everybody at 8:00 a.m.

When court reconvened the following morning, appellant's attorney stated that he had "no objection" to the instructions that the trial court was about to read. Based on the fact that appellant failed to get a ruling on his initial objection, we consider it to be withdrawn and treat it as though the objection was never made. *Wallace v. State*, 2009 Ark. 90, at 16–17, 302 S.W.3d 580, 590. As such, we do not reach the merits of his lesser-included-instruction argument on appeal.

■ Appellant also claims that the trial court erred by denying his mistrial motion based on his claim that the jury completed inconsistent verdict forms. However, appellant did not tender his mistrial argument until two weeks after his trial concluded—during the sentencing phase. According to our well-developed law, in order to preserve this argument for our review, appellant was required to move for a mistrial at the first available

opportunity. *See Smith v. State,* 330 Ark. 50, 54, 953 S.W.2d 870, 872 (1997). Here, the trial court pointedly inquired if appellant would like to poll the jury after reading the following verdict form: "We the jury find Phillip Holloway guilty of Murder in the Second Degree" and announcing that the jury also completed the forms finding appellant not guilty of first-degree murder, manslaughter, and negligent homicide. Appellant responded, "no." As such, because a timely objection was not offered below, we are unable to consider appellant's mistrial argument on appeal.

■ For his final point on appeal, appellant argues that the trial court erroneously allowed Dr. Peretti to testify about what occurs when a vehicle is submerged into water. After considering appellant's objection, the trial court limited Dr. Peretti's testimony to how he utilized the forensics relating to Erma's submerged vehicle to determine her cause of death. Then, Dr. Peretti gave the following testimony:

DEPUTY PROSECUTOR: Did you use your 20 years of experience in forensic pathology and the facts you knew about this case and the condition of the body in making your determination as to the manner of death?

DR. PERETTI: Yes.

DEPUTY PROSECUTOR: Okay. What impact would the fact that the car was pulled from the pond with the windows up and the doors closed, what impact does that information have upon your analysis?

. . .

DR. PERETTI: A lot of cases I have seen here in Arkansas, when, when cars go into water, [the] vast majority of bodies are recovered inside the vehicle, because it is very difficult to get out of the vehicle. And the reason for that is: In order to open the door in a vehicle, you have to have equalized pressure. So,

the car would have to fill up with water, okay. So, you would have to remain in the car, be calm, let the car fill up with water, and then open the door, okay, to get out of the vehicle. Second, once the door is opened and the car is in the water, you ... can't close the door, because of the pressure; the doors stay open.

Despite the fact that appellant objected *prior* to Dr. Peretti's testimony, we are unable to consider whether Dr. Peretti exceeded the scope of permissible expert testimony because appellant failed to object *during* or *after* the above-captioned testimony. His failure to contemporaneously object precludes our consideration of his final point on appeal. *Camacho–Mendoza v. State,* 2009 Ark. App. 597, at 9, 330 S.W.3d 46. We affirm the trial court in all respects.

Affirmed.

GLOVER and BAKER, JJ., agree.